627 P.2d 221

**In the Matter of Kelly HADDAD, Justice of the Peace, Pinal County, Arizona.**

**No. JUD–4.**

Supreme Court of Arizona,
In Banc.

March 26, 1981.

Bruce A. Burke, Tucson, Atty. for Commission on Judicial Qualifications.

Gerald S. Maltz, Tucson, Atty. for respondent.

CAMERON, Justice.

The Arizona Commission on Judicial Qualifications found that the respondent, Kelly Haddad, Justice of the Peace, Pinal County, Arizona, violated Canons One, Two and Three of the Code of Judicial Conduct, Rule 45, Rules of the Supreme Court, 17A A.R.S., and Article 6.1, § 4 of the Constitution of the State of Arizona, and censure was recommended. We have jurisdiction pursuant to Article 6.1 of the Arizona Constitution and Rule 11 of the Rules of Procedure for the Commission on Judicial Qualifications, 17A A.R.S.

This is the first time we have been called to write upon findings and recommendations of the Commission on Judicial Qualifications since it was created by constitutional amendment approved by the voters on 3 November 1970. This then is a case of first impression. Fortunately, there is adequate and generally consistent case law from other jurisdictions, as well as Standards Relating to Judicial Discipline and Disability Retirement adopted by the American Bar Association in 1978 to guide us in reaching our decision. National Center for Professional Responsibility and the American Bar Association, Professional Discipline for Lawyers and Judges (1979). See Judicial Discipline and Disability Symposium, 54 Chi.-Kent L.Rev. 1 (1977).

Judicial discipline is analogous to lawyer discipline in that both lawyer discipline commissions and judicial qualification commissions can only recommend to the Supreme Court the disposition to be made in each case of discipline. While we will give serious consideration to the findings of the attorney discipline committee, we must also make an independent determination of the facts of the case, *In re Stewart*, 121 Ariz. 243, 589 P.2d 886 (1979); *In re Lurie*, 113 Ariz. 95, 546 P.2d 1126 (1976), and we are the ultimate trier of the facts as well as the law. *In re Moore*, 110 Ariz. 312, 518 P.2d 562 (1974). Likewise in judicial discipline matters, we must make an independent evaluation, or de novo review on the record, of the evidence and recommendations of the Commission on Judicial Qualifications. *In re Cieminski*, 270 N.W.2d 321 (N.D.1978).

"The rationale for requiring an independent evaluation of the evidence and recommendation is that the Act puts the burden of imposing the sanction squarely on the Supreme Court; the Commission has power only to recommend. With the power to impose a punishment comes the concomitant obligation to conduct an independent inquiry into the evidence to determine whether that evidence merits imposition of the sanction recommended. (footnote omitted)" *In re Heuerman*, 90 S.D. 312, 317, 240 N.W.2d 603, 606 (1976); see also Judicial Standards, supra, 7.8, 7.9, and 7.11; *In re Buford*, 577 S.W.2d 809

(Mo.1979); *McCartney v. Commission on Judicial Qualifications*, 12 Cal.3d 512, 526 P.2d 268, 116 Cal.Rptr. 260 (1974).

The purpose of judicial discipline is not to punish the individual judge, but to maintain the high standards of the judiciary and the proper administration of justice. *In re Diener*, 268 Md. 659, 304 A.2d 587 (1973), cert. denied 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974). Judicial discipline protects the public and the integrity of the judicial process and is a balancing of the need for an independent judiciary with the necessity for removal of those who do not measure up to the high standards required of a person holding judicial office. *In re LaMotte*, 341 So.2d 513 (Fla.1977). As such, the proceeding is neither civil nor criminal, *In re Nowell*, 293 N.C. 235, 237 S.E.2d 246 (1977), but sui generis. *In re Cieminski*, supra. Neither should judicial discipline be used as a substitute for appeal:

> "In the absence of fraud, corrupt motive, or bad faith, the commission should not take action against a judge for making findings of fact, reaching a legal conclusion, or applying the law as he understands it. Claims of error should be left to the appellate process." Judicial Standards, supra, 3.4.

The burden of proof in judicial discipline is by clear and convincing evidence:

> "[1] The first issue we consider is appropriate standard of proof in proceedings under the Act. We note that it would be inapposite to require proof 'beyond a reasonable doubt' as this is not a criminal prosecution. Proof by a mere preponderance of the evidence is also inapposite because of the severity of the sanction which can be imposed. We conclude that the proper standard of proof is by 'clear and convincing evidence.' Such a standard provides adequate protection for the party subject to charges, but at the same time does not demand so much evidence that the ability of the Commission and this court to effectively oversee the judiciary is impaired * * *. See *In Re Hanson*, 1975, Alaska, 532 P.2d 303; *Geiler v. Commission on Judicial Qualifications*,

1973, 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1. See also, *In Re Haggerty*, 1970, 257 La. 1, 241 So.2d 469, 479; *In Re Diener*, 1973, 268 Md. 659, 304 A.2d 587; *In Re Rome*, 1975, 218 Kan. 198, 542 P.2d 676." *In re Heuerman*, supra, 90 S.D. at 316, 240 N.W.2d at 605–06; see also *In re Cieminski*, supra; Judicial Standards, supra, 5.17 and 7.10.

Article 6.1 of the Arizona Constitution provides for the establishment of a judicial qualifications commission and the article is similar to constitutional provisions enacted by a majority of the states since the first constitutional provision was adopted by the California voters in 1960. See Schoenbaum, A Historical Look At Judicial Discipline, 54 Chi.-Kent L.Rev. 1 (1977); Gillis & Fieldman, Michigan's Unitary System of Judicial Discipline: A Comparison With Illinois' Two Tier Approach, 54 Chi.-Kent L.Rev. 117 (1977).

Our Constitution reads:

> "Section 4. On recommendation of the commission on judicial qualifications, the supreme court may * * * censure or remove a judge for action by him that constitutes wilful misconduct in office, wilful and persistent failure to perform his duties, habitual intemperance or conduct prejudicial to the administration of justice that brings the judicial office into disrepute. ********** " Ariz.Const., Art. 6.1, § 4.

The Code of Judicial Conduct adopted 16 August 1972 by the American Bar Association has been adopted by the Arizona Supreme Court, as amended, and applies to all judges in the state including non-lawyer justices of the peace, as is the respondent in this case. That code provides in pertinent part:

> "Canon 1
>
> A Judge Should Uphold the Integrity and Independence of the Judiciary
>
> * * * * * *
>
> Canon 2
>
> A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities
>
> * * * * * *

Canon 3

A Judge Should Perform the Duties of His Office Impartially and Diligently." Rule 45, Rules of the Supreme Court, 17A A.R.S.

In the instant case, respondent Kelly Haddad is the Justice of the Peace in Justice Court Precinct 7 of Pinal County. In 1978, there were 1,709 registered voters in this precinct. At the time of the hearing, he had been a justice of the peace for over 22 years. He is not a lawyer.

The Commission heard evidence concerning three counts of alleged judicial misconduct. Count II was dismissed, and findings of misconduct with recommendations of censure were made as to Counts I and III. Respondent made no objections to the findings and recommendations as to Count III, but as to Count I he did object to some of the findings and also conclusion of law number 2.

## COUNT I

Prior to September 1978, the Department of Public Safety believed that respondent was dismissing too many cases filed in his precinct. Highway Patrolman Don Judd stated that respondent was "too easy" on traffic offenders. As a result, it was decided to make an investigation of respondent's procedures. Judd testified as to his instructions:

"* * * I was to go up there and work with a radar. They had some—bought new radar. I was supposed to write good citations, no making anything up in Mr. Haddad's precinct. I was supposed to keep a record of all the citations that I wrote and do follow-up on disposition from the court. That was basically it."

And:

"They would—at one point I was supposed to go in and talk to Judge Haddad, and they put a microphone on me, hidden microphone and a tape recorder and I was supposed to find out the dispositions and why he dismissed a couple of citations, well, more than two citations. They were in the vehicle outside recording all this. But that's about, basics."

On the back of each uniform traffic ticket is a place to check which indicates the disposition of the complaint. These dispositions are "coded" and mesh with computerized accounting systems. Code 30 is "not guilty, acquitted." Code 43 is "charged dismissed by judge." Code 44 is "charge dismissed by judge at the request of prosecutor," and Code 45 is "charge dismissed by judge at request of officer." Other codes concern pleas of guilty, fines and the appearance of the defendant. The testimony indicated that of about 52 citations issued by Officer Judd in August and September of 1978, 18 or 34.6% were dismissed by the judge pursuant to Code 43. The testimony indicated that dismissal by a judge pursuant to "Code 43" without consultation with the officer is commonly done, and respondent's jurisdiction and discretion in making this disposition of a traffic citation is not in question. Also, it should be noted that the state could have refiled some of the matters in the Superior Court and, in fact, when this procedure was suggested to respondent by Judd, respondent did not object. As Judd testified:

"Q Again, you had this surreptitious— well, this concealed device on your person and taped that conversation?

"A Yes, sir.

"Q That's the tape that is now in evidence?

"A Yes.

"Q What did Judge Haddad say to you when you made inquiry about refiling in superior court?

"A He said he didn't care.

"Q What did he say to you when you indicated to him that you wanted to refile those in his court?

"A He said not in my court.

"Q Did he give you a reason that you could recall?

"A Only that they had already been taken care of once, that he didn't want to handle them again."

It is the testimony of Judd and respondent that respondent was unhappy with the

Highway Patrol for initiating a great number of citations just prior to respondent's primary election, the 12th of September. It would appear that respondent felt that by "flooding" his precinct with traffic tickets just prior to the election he was being embarrassed politically. From the taped conversation between Judd and the respondent, respondent stated:

"[I]t was a couple of days before election when you started working the area, so I dismissed a few that I shouldn't have dismissed.

"I thought you guys [in the Highway Patrol] were taking a potshot at me, and you hadn't worked the area for two years * * * and all of a sudden just before election * * * here you come * * *."

Judd admitted that he "purposefully wrote wrong" one drunk driving citation so that it would be returned to respondent's court rather than the San Manuel City Court.

Respondent testified as to his reasons for dismissing two drunk driving cases. The traffic tickets indicated a blood alcohol content (as determined by the defendants' breath at the time of arrest) of .19 for Robles and .26 for Estrada. The presumptive level is .10. A.R.S. § 28–692(B)(3). Respondent testified regarding these two tickets:

"Q So it is your testimony, sir, that you were going to permit the status of Mr. Robles' case to remain as it was, knowing that he was charged with a DWI, you were still willing to let what happened happen and not willing to tell Mr. Judd to at least handle that ticket in terms of which court to go to?

"A I think I properly handled it myself when Mr. Robles came in to me. I didn't just dismiss and say, Mr. Robles, forget it. I had a long and serious talk with Mr. Robles.

"Q Are you saying, sir, that you feel you made a disposition of that case after talking to Mr. Robles?

"A I think so.

"Q Is it your testimony then, sir, that what you were doing was listening to that case and making a decision about it?

"A Sure, I was making a decision.

"Q Well then, you were considering the offense, is that correct?

"A Definitely.

"Q And you told him what, sir?

"A At that time I told him he had a drinking problem and that I had had him before me in Mammoth court when I was sitting in the Mammoth court several years before and I had sentenced him to 30 days in the county jail. I felt that didn't do him any good. I thought that my talking to him and telling him that he had a serious drinking problem and that he better take care of it, that it would do some good. * * *

* * * * * *

"Q So you feel that what you did on that occasion was make a fair disposition of that case on its merits?

"A I think so.

"Q With respect to Mr. Estrada, sir, he also came in to see you on the day before the election, did he not?

"A He did.

"Q On that ticket, you simply dismissed it.

"A Same thing; I talked to Mr. Estrada, but Mr. Estrada is a hopeless case.

"Q You talked to Mr. Estrada knowing full well that you had jurisdiction over the case, didn't you?

"A No, I talked to him because I felt that—the citation was in my office, I was going to dismiss, but I felt that I had an obligation, as a justice of the peace to talk to the man and tell him why I was dismissing.

* * * * * *

"Q Yet, sir, because it was the day before the election and because you thought the highway patrol was taking a pot shot at you, you dismissed it, didn't you?

"A Well, partly for that reason."

After the dismissal of the tickets and after it became apparent that an investigation was being made into the conduct of respondent, he had the record of the court changed in four cases. For example, in citation Number 2211392, on 2 September 1978, the docket sheet showed "dismissed by Judge Kelly Haddad." The docket sheet was then altered so that the period after "Judge Kelly Haddad." was changed to a comma, and the following addition was made, "citation issued out of jurisdiction." Although the evidence would indicate that in the case of this citation the citation was in fact issued out of the jurisdiction and the reasons stated were correct, still the motivating factor in making this change was not based upon jurisdiction, but was in response to his knowledge of the investigation.

Amelia Burns, respondent's clerk, testified at the hearing before the Commission as follows:

"Q Do you recall a time, ma'am, when Judge Haddad came to you and asked you to make some changes in a docket entry, one or more docket entries in your court?

"A Yes, I do.

"Q And those changes concerned docket entries with respect to the—some of the 10 citations that are the subject of this inquiry, are they not?

"A Yes, sir.

"Q At the time that that occurred, ma'am, that was a fairly unusual occurrence in your court, was it not?

"A Yes, sir.

"Q In fact, it had never happened before?

"A Not that I can recall.

"Q Ma'am, the time that Judge Haddad came to you, he identified four matters that he wanted changed?

"A Yes, sir.

"Q He instructed you to remove those docket entries from the docket book and add some phraseology to them, is that correct?

"A Yes, sir.

"Q In fact, change a period to a comma and add another phrase?

"A Yes, sir."

Although she stated at the hearing that she did not remember whether she knew of the inquiry of the Commission at the time she made these changes, in her deposition she had testified as follows:

"Question: * * * You were aware at the time that Judge Haddad came in to see you, were you not, that he was the subject of a notice of inquiry concerning the commission on judicial qualifications?

"Answer: Yes, I was."

After investigation and hearing by the Commission on Judicial Qualifications and objections by the respondent to the proposed findings and conclusions of law, the following findings of fact and conclusions of law were adopted by the Commission:

## COUNT I

"1. At all times pertinent hereto, KELLY HADDAD was the duly appointed Justice of the Peace for Precinct 7, Pinal County, Arizona. Said precinct includes the City of Kearny, Arizona, within its jurisdiction.

"2. During the months of August through October, 1978, a uniformed officer of the Highway Patrol Bureau, Department of Public Safety, was assigned to patrol duty in an area which included the jurisdictional boundaries of Precinct 7, Pinal County, Arizona.

"3. While on patrol, said uniformed officer issued traffic citations to persons alleged to have violated Arizona laws regulating traffic on highways, including the following cases:

[LIST OF 10 CITATIONS OMITTED]

"4. With the possible exception of Citations 2211409, 2211407 and 2211392, each of the above-described traffic citations came within the jurisdiction of Justice Court No. 7, Pinal County, Arizona.

"5. Upon receipt of each of the above-referenced traffic citations and after having discussed the subject matter of the citations with the respective defendants named therein, Judge Haddad ordered a Code '43' dismissal. According to the Rules of Procedure In Traffic Cases, adopted by the Supreme Court of Arizona, a Code '43' dismissal denotes that the subject citation was dismissed on motion of the court or the defendant. In each instance herein, the citation was summarily dismissed on the Court's own motion.

"6. The dismissal of Citation No. 2211255 and the referral of this matter to Juvenile Court was appropriate by reason of the fact that the Defendant, _____, was under the age of eighteen years.

"7. None of the remaining citations were dismissed for any authorized or accepted judicial reason or purpose.

"8. Each of said citations were, in fact, dismissed either as a favor to the named defendant or for reasons of a personal or political nature on the part of Judge Haddad.

"9. Following a conversation with the arresting officer, at which time the officer complained of the summary dismissal of his traffic citations, Judge Haddad directed the Clerk of his Court to alter "the Court records by adding the words 'citation issued out of jurisdiction' to the docket entries in the following cases:

 A. State of Arizona v. _____
 Citation No. 2211406

 B. State of Arizona v. _____
 Citation No. 2211409

 C. State of Arizona v. _____
 Citation No. 2211407

 D. State of Arizona v. _____
 Citation No. 2211392

"10. Although Citation No. 2211406 had been issued within the City Limits of Kearny, Arizona, and the usual procedure would have been to cite the defendant into the Kearny City Court rather than the Justice Court, Judge Haddad nevertheless had jurisdiction over that case and knew he had such jurisdiction. Citations 2211409, 2211407 and 2211392, were issued at either milepost 133 or 134 on Highway 77, outside Judge Haddad's territorial jurisdiction, but he had acted on citations issued at those locations on other occasions.

"11. In any event, the question of 'jurisdiction' was not the motivating factor at the time of the dismissal of the four citations by Judge Haddad.

"12. Although Judge Haddad sincerely believed that justice was ultimately served by his dismissal of at least several of the above-mentioned traffic citations, his reasons for doing so were nevertheless improper.

## CONCLUSIONS OF LAW

"1. The above-described conduct of Judge Haddad violated the Code of Judicial Conduct as adopted in Rule 45 of the Rules of the Supreme Court of Arizona in Canons, One, Two and Three thereof.

"2. The above-described conduct of Judge Haddad constituted wilful misconduct in office within the meaning of Article 6.1, Section 4 of the Constitution of the State of Arizona.

"3. The above-described conduct of Judge Haddad constituted conduct prejudicial to the administration of justice and said conduct brought his office into disrepute within the meaning of Article 6.1, Section 4 of the Constitution of the State of Arizona."

## I. OBJECTIONS TO FINDINGS

a. Findings 1 and 5

Respondent objects to some of the findings in that they did not contain evidence of a mitigating nature. For example, he first asks that Finding 1 be amended to show that he

"enjoys a good reputation in the community, and among the Superior court judges of Pinal County. He is not a lawyer. He has never had any formal legal training."

And that Finding 5 read:

"There was undisputed proof at the hearing that other lay Justices of the Peace

summarily dismiss traffic citations under Code '43' after discussion with the named defendants. No statutory or case law was cited to the Commission which specifically prohibits such Code '43' dismissals. No statutory case law was cited to the Commission providing any guidelines as to when a Code '43' dismissal may be exercised. There is ambiguity and confusion with respect thereto."

While we do not believe that the findings of the Commission were incorrect, we do note and consider the evidence of respondent's good reputation among the judges of Pinal County and his lack of any formal legal training.

We also recognize that it is the practice of justices of the peace to "summarily dismiss" traffic citations under Code 43. This is frequently done after discussion with the defendant and without discussing the matter with the citing officer, and no statute or case law prohibits this. In fact, the disposition code on the back of the uniform traffic ticket appears to specifically sanction this procedure. We would point out, however, that it is precisely because no reasons need be given for the action of the court in dismissing pursuant to "Code 43" that extra care must be taken to insure that no improper influences play a part in the exercise of that discretion.

b. Finding 8

Respondent, while admitting that the citations were dismissed for personal or political reasons, urges that Finding Number 8 should be amended to read as follows:

"Each of said citations were, in fact, dismissed for personal or political reasons in that it involved one or more of the following factors: (a) Judge Haddad's belief that criminal prosecution did not serve the ends of justice (e. g., the case of alcoholic defendants who have sought treatment for their disease); (b) Judge Haddad's belief that there were 'mitigating' circumstances (e. g., accused speeders who were clocked by the Highway Patrol at only a few miles above the speed that the Highway Patrolman had discretion as

to whether to cite); and (c) believed the explanation or sincerity of the defendant; (d) believed that the issuance of the citations was politically motivated by the Highway Patrol who did not support him for re-election."

We do not believe Finding Number 8 is incorrect nor should it be changed. We do, however, consider the other reasons given by the respondent for dismissing the citations.

## II. CONCLUSIONS OF LAW

The Commission found that respondent violated (1) the Code of Judicial Conduct, (2) the "wilful misconduct" provision of the Constitution, Article 6.1, § 4, and (3) the prejudicial conduct provisions of the Constitution. Respondent objects only to Conclusion of Law Number 2 which states:

"2. The above-described conduct of Judge Haddad constituted wilful misconduct in office within the meaning of Article 6.1, Section 4 of the Constitution of the State of Arizona."

"Wilful misconduct" is graver conduct than the lesser included "conduct prejudicial to the administration of justice." As was noted by the California Supreme Court:

"As indicated above, the Commission in the instant matter concluded that the conduct proven in the previously discussed specifications constituted 'wilful misconduct in office' and 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute.' As we have noted above, the second ground for imposing discipline was added to the Constitution in 1966. We believe this mandates our construing 'wilful misconduct in office' as connoting something graver than the 'lesser included offense' of 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute.' The more serious charge should be reserved for unjudicial conduct which a judge acting in his judicial capacity commits in bad faith, while the lesser charge should be applied to

conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office. (footnote omitted)" *Geiler v. Commission on Judicial Qualifications*, 10 Cal.3d 270, 283–84, 515 P.2d 1, 9, 110 Cal.Rptr. 201, 209 (1973), cert. denied 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974).

 We believe the acts of the respondent in the instant case are more than innocent conduct which is "prejudicial to the administration of justice" and "brings the judicial office into disrepute." Admittedly, the respondent received no money or favors for his dismissals, and there was no corruption in the sense that there was an agreed quid pro quo for his actions. Also, he may have felt that he was being singled out by the Department of Public Safety for special attention, as indeed he was, and was entitled to respond. However, favoring his constituents over others who appear before him makes the administration of justice suspect. There is a positive obligation on the part of a judge not only to be impartial, but to be seen to be impartial:

"A judge or justice of the peace in fulfilling his judicial function must not only strive to insure fair treatment toward every individual who appears before him, but he must also present the appearance of fairness and probity in his behavior as a judicial officer. If that appearance falters, the confidence of the public will naturally wane." *In re Franciscus*, 471 Pa. 53, 62, 369 A.2d 1190, 1195, cert. denied 434 U.S. 870, 98 S.Ct. 212, 54 L.Ed.2d 148 (1977).

Respondent's actions most certainly gave the appearance of favoritism, special treatment and impropriety. We might be persuaded that respondent's conduct was based upon lack of knowledge as to his responsibilities as a judge were it not for the changing of the court's docket after notice that the dismissals were being questioned. These activities constituted wilful misconduct in office, and when considered along with respondent's lack of candor when questioned about the change clearly brings respondent's actions within the provisions of the more severe provisions of the Constitution. Respondent's conduct was, by clear and convincing evidence, wilful, and Finding Number 2 is affirmed.

## COUNT III

Respondent owns and operates a retail store with his wife known as "Haddad's Fine Apparel," located in Kearny, Arizona, within respondent's precinct. From 1972 until 1979, there have been filed in respondent's court some 17 civil complaints for amounts due and owing to the store. In some instances, writs of garnishment have issued out of the court after default. The complaint would be issued under respondent's name, and he would make a decision as to the amount of the judgment and when to issue a writ of garnishment. The testimony of respondent was that if the matter was contested, a judge from another precinct would be called to sit on the case and render judgment, but in the absence of a contest, respondent would determine the matter.

As to Count III, the Commission made the following findings:

"The following stipulation of facts was submitted to the Commission and accepted in lieu of testimony with reference to the allegations of Count III of the Commission's Notice of Inquiry:

1. At all times pertinent hereto Kelly Haddad held the office of Justice of the Peace in Pinal County, Arizona. His Court is located in Kearny, Arizona, which is a small town with an approximate population of 3,000. The next available Justice of the Peace Courts in Pinal County are located approximately 25 miles from Kearny, in Mammoth and Superior, Arizona.

2. From 1972 to the present time Judge Haddad and his wife, Navval Haddad, have owned and operated a retail store known as Haddad's Fine Apparel. This enterprise does business in Kearny, Arizona, which is located within Judge Haddad's precinct.

3. During the period from 1972 to the present time, Judge and Mrs. Haddad filed the following civil complaints in the Justice Court of Judge Haddad, Pinal County, Arizona, in the name of Haddad's Fine Apparel, against named defendants who were retail customers allegedly owing money on accounts at the store:

[LIST OF CIVIL ACTIONS OMITTED]

4. As indicated by the above, each complaint was signed by Navval Haddad, as Plaintiff. Upon filing each complaint, Judge Haddad's clerk would issue a summons to the defendant. Judge Haddad's signature and seal of office appeared on each summons, which was thereafter served upon the defendant with the complaint. Each summons constituted a command from Judge Haddad's Court to the named defendant to answer the complaint within stated time periods.

5. In each of the cases referenced above, Judge Haddad entered a default judgment in the amount prayed for in the complaint after the named defendant failed to file an answer within the required time period. In entering a default judgment on the above cases, Judge Haddad made an adjudication on the merits in those cases. Thereafter, Judge Haddad sent written notice to the defendant that a default judgment had been entered.

6. In most instances, after entry of default the named defendant made payment on the default judgment directly to the Haddads at their store. On occasion, a defendant would tender a judgment payment directly to the court. Records were maintained of those payments tendered to the court.

7. In the cases of Haddad's Fine Apparel v. _____, No. 1933, and Haddad's Fine Apparel v. _____, No. 1865, garnishment proceedings were undertaken by Judge Haddad after he had entered a default judgment.

8. At the time of the filing of the foregoing civil actions, Judge Haddad was unaware of the impropriety of filing civil cases in which he had a pecuniary interest in his own Court.

9. Judge Haddad now recognizes the impropriety of such conduct and has avowed that it has been discontinued.

### CONCLUSIONS OF LAW

1. The above-described conduct by Judge Haddad violated the Code of Judicial Conduct as adopted in Rule 45 of the Rules of the Supreme Court of Arizona in Canons One, Two, Three and Five thereof.

2. The above-described conduct of Judge Haddad constituted conduct prejudicial to the administration of justice, and said conduct brought his office into disrepute within the meaning of Article 6.1, Section 4 of the Constitution of the State of Arizona."

Respondent admitted that he had on occasion filed civil suits in his own court. He stated:

"May I answer it this way: I have never felt that I was doing anything wrong until the other day when Mr. Burke was taking my deposition and he mentioned the fact that my name appeared on the summons and complaint and that maybe that individual, because of my name appearing as the justice of the peace on the summons and complaint saw that and would be a little bit reluctant to come in and answer to the complaint. I feel that there is a probability that that is possible and I have agreed to refrain from filing any more with my signature. I will, from here on out, send them, mail the summons and complaint to either the court in Superior or the court in Mammoth; have the justice of the peace there sign it, then have it served by the constable wherever it is and filed in my court, of course, to give me the same advantages as any other merchant there in the community."

However well-intentioned respondent may be, we believe he misses the point when he indicates he should have the "same advantages as any other merchant

* * * in the community." Whenever there is a reasonable, even though inconvenient, alternative, a judge should not file a civil action in his own court. It may well be that he will have to go to another precinct to file his causes of action or even to the Superior Court and there will be some delay because of the filing outside his precinct. We do not believe, however, that it is unreasonable to expect that one of the things a justice of the peace will give up upon becoming a justice of the peace is the convenience or "same advantage" of filing an action in his own precinct. Indeed, both the statutes, see A.R.S. § 22–203, and the Canons demand that he must do so. A judge should not only "avoid impropriety," but the "appearance of impropriety." Canon 2, supra. A civil defendant sued in a court presided over by the plaintiff in the case cannot have the same confidence that he will receive a fair and impartial disposition of his matter as he would in another court before another judge. Despite the intention of the judge-plaintiff to disqualify himself should the matter be contested by the defendant, the matter should, if at all possible, be filed, heard and determined in another court.

We recognize that some justices of the peace have legitimate business interests outside the court, and these interests will be allowed as long as they do not violate Canon 5, and particularly Section C thereof, relating to financial activities of a judge. Canon 5; Rule 45, Rules of the Supreme Court, 17A A.R.S. When those interests begin to compromise the integrity of the judicial process or bring into question the impartial administration of justice, the justice of the peace must make a choice, either to leave the bench, in which case he will have the "same advantage" as other merchants in the community, or to divest himself of his business interests, thereby insuring the independence and integrity of the judicial process.

The Commission's findings and conclusions of law in Count III are affirmed.

## RECOMMENDATION

The Commission made the following recommendation:

"Based upon the foregoing findings of fact and conclusions of law, it is the recommendation of this Commission to the Arizona Supreme Court, pursuant to Article 6.1, Section 4, of the Arizona Constitution, that Judge Haddad be publicly censured for his misconduct as found by this Commission.

"The Commission recommendation has been tempered by its understanding that 'Code 43 dismissals' of traffic citations by lay justices of the peace for other than authorized or accepted judicial reasons has been a matter of some ambiguity and confusion in the past and the seriousness of such misconduct has not heretofore been fully recognized.

"The Commission is also cognizant of the fact that Judge Haddad enjoys a good reputation in his community having served as Justice of the Peace for approximately 21 years."

■ Our Constitution provides that we "may censure or remove a judge" for misconduct. Ariz.Const. Art. 6.1, § 4. We thus have only two options—censure or removal. We may not fine nor may we suspend. We therefore reluctantly apply the lesser punishment of censure. In doing so, we agree with the Commission's finding that the law was not clear to respondent as to what his duties and responsibilities were under a "Code 43" dismissal and that respondent was held in high esteem in his community. We are also aware that in a small precinct such as respondent's, many if not most of the people who appear before the court are well known to the judge. This puts strong and at times seemingly unfair pressure on the justice of the peace in discharging his duties, especially just before election. We are reminded, however, that:

"A judge who does 'favors' with his office is morally an embezzler. He is also a fool, for a judge who plays a 'good' fellow for even a few must inevitably be stained with the reputation of a man who can be reached." *In re Mattera*, 34 N.J. 259, 275–76, 168 A.2d 38, 47 (1961).

Considering that the respondent is not an attorney, seems contrite, and the likelihood that the conduct will not be repeated, we agree with the recommendation of the Commission and impose censure. We wish to state, however, that part of the reason for this lesser discipline is that this is the first case in which the conduct of a justice of the peace has been questioned in this court by the Commission on Judicial Qualifications and which has been disposed of by a written opinion of this court. It may be that the respondent was not aware of the strict ethical requirements imposed upon him by the Constitution and the Code of Judicial Conduct. Henceforth, judges in this state, be they lawyer or nonlawyer, are on notice that this court will demand of them the highest standards of conduct, and censure as opposed to the removal from office will be the exception rather than the rule in matters as serious to the administration of justice as is evidenced by the facts of this case.

Respondent Justice of the Peace Kelly Haddad, for the reasons contained in this opinion, is formally and publicly censured.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and GORDON, JJ., concur.