745 P.2d 92

**In the Matter of Fred S. ACKEL, Justice of the Peace, Tempe Precinct, Maricopa County, State of Arizona.**

**No. JQ–87–0001.**

Supreme Court of Arizona.

Oct. 27, 1987.

Burch & Cracchiolo by Jack D. Klausner, Marigene A. Dessaint, Anne E. Findling, Phoenix, for respondent.

Rubin, Croxen & Myers by Edith A. Croxen, Tucson, for Com'n on Judicial Qualifications.

Landau & Hamilton by Lynn Hamilton, Chandler, for amici curiae Justices of the Peace Lockwood, Goodman, Connor and Phares.

Richards & Eisenstein by Alyce Pennington and Robert B. Fleming and Arizona Women Lawyers Ass'n by Lynne O. Wood, Tucson, for amici curiae Pima County Gender and Justice Task Force, Pima County Bar Ass'n and Arizona Women Lawyers Assn.

PER CURIAM.

The Commission on Judicial Qualifications (Commission) has recommended that we remove Fred S. Ackel from his position as Justice of the Peace, Tempe Precinct, Maricopa County, for violating Canons 1 and 2(A) of the Code of Judicial Conduct and Arizona Constitution article 6.1, section 4.[1] We have jurisdiction pursuant to Rule

---

1. Canon 1 provides:

    **A Judge Should Uphold the Integrity and Independence of the Judiciary.**

    An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved....

    Canon 2 provides:

    **A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities.**

    **A.** A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

    Arizona Constitution art. 6.1, § 4 provides:

    On recommendation of the commission on judicial qualifications, the Supreme Court ... may censure or remove a judge for action by him that constitutes wilful misconduct in office, wilful and persistent failure to perform his duties, habitual intemperance or conduct prejudicial to the administration of justice that brings the judicial office into disrepute....

15, Rules of Procedure for the Commission on Judicial Qualifications, 17A A.R.S.

## I

In March 1985, Ackel issued a peace bond on behalf of Tina Randall against James Bankhead. Bankhead continued to harass Randall via the telephone. Randall met with Ackel on June 10, 1985, to discuss the possibility of amending the peace bond to preclude Bankhead from harassing Randall via the telephone. Ackel amended the peace bond and asked Randall to return to see him on June 14.

According to Randall, Ackel made several statements to her during the meeting on June 10 that concerned her. When Randall informed Ackel that she was living with her cousin, Ackel asked whether Randall and her cousin were "kissing cousins" and then proceeded to state that his cousin had taught him everything he knew, including "how to put a rubber on." Ackel later in the discussion said, "I'm oral. Are you?" Randall replied, "Not with you." At some point during the meeting Randall believed that Ackel was "staring at [her] chest." Ackel also hugged Randall "chest to chest" or "chest to belly" in a "snug" manner. Randall denied flirting with Ackel or in any manner encouraging Ackel's conduct.[2]

Randall hid a tape recorder in her clothing and secretly recorded her discussion with Ackel on June 14. During their discussion Ackel referred to Randall as "honey" and commented to Randall that she was "cute" and "brightened" his day.

Ackel also indicated that he had contemplated calling her to see if she wanted to get together that night to have a drink. When Randall replied that she was busy, Ackel remarked, "That's too bad." Ackel later asked Randall for the name of the person with whom she would be busy, and then he hugged Randall. The following conversation occurred during the embrace:

JUDGE: (laughter)

JUDGE: (inaudible)

RANDALL: It's a friend.

JUDGE: Well, I'm a friend!

RANDALL: I know you are.

JUDGE: I know I am, too—now, I really am. O.K. Well, I'll give you a call, maybe another night.

RANDALL: O.K.

JUDGE: If you want to.

RANDALL: I don't know—I—I really don't think so.

JUDGE: Oh, you're thinking—you're thinking sexually because of the way (inaudible)

RANDALL: Well, I don't know what you're thinking.

JUDGE: I'm thinking about you having somebody to talk to as a friend. Don't you let them think that.

RANDALL: Well, at our last—

JUDGE: (inaudible)

RANDALL: —meeting I got—

JUDGE: (inaudible)

RANDALL: —the impression—

JUDGE: Yeah.

\*　\*　\*　\*　\*　\*

Q. Do you recall talking about an oral fixation, or asking her if she was oral during that conversation?

A. I don't—I don't recall the exact words used.

Q. Do you deny that there were any sexual overtones in your conversation with Tina Randall on June 10th?

A. There could have been. There could have been mistaken for sexual overtones.

Q. Assuming that she testified accurately, that you actually said the things that she says you said, would you agree that there were sexual overtones in that conversation?

A. It could be construed that—yes.

Transcript dated March 21, 1986, at 37–39.

2. Ackel's testimony before the Commission concerning the June 10 conversation was as follows:

Q. [Commission Attorney]: Do you recall the conversation about the kissing cousins and the prophylactics?

A. I recall talking about cousins.

Q. And you do not recall any conversations regarding a prophylactic or rubber or any language to that effect?

A. I can't recall if I said that particular terminology.

Q. Do you think if you had said something like that, you would recall it? Is that the kind of thing you normally would say to a person and then forget shortly thereafter, or would you remember saying something like that?

A. I might—I might be able to recall if I said it in that specific form.

RANDALL: —slightly, you're that way.
JUDGE: Yeah, I'm that way. I'm just—I'm a hugger and a kisser and I talk like that, so, don't (inaudible) it takes two to tango, remember that.

Ackel then released Randall. Later Ackel said to Randall, "I'm a very outgoing person, so don't get the wrong impression." He also told Randall, "I've never forced myself on anybody."

In addition to Ackel's sexual comments, the transcript also indicated that Ackel referred to Bankhead as a "son of a bitch" and said "If I have to raise some more hell, I'll have him arrested ... [i]f I have to make my God damned point," and commented on getting Bankhead "in [his] clutches."

Randall filed a Request for Investigation with the Commission on July 11, 1985. The Commission initiated formal proceedings against Ackel on September 17, 1985, and filed its amended findings of fact, conclusions of law, and recommendation on January 16, 1987. The Commission concluded as a matter of law that:

1. The Respondent's [Ackel's] conduct in "hugging" the litigant [Randall], using profanity and language with sexual overtones and asking the litigant to go "for a drink" with the Respondent was inappropriate judicial conduct which violated Canon 1 of the Code of Judicial Conduct. The Respondent's conduct described herein is an intentional and wilful course of conduct which constitutes misconduct in that it is prejudicial to the administration of justice so as to bring the judicial office into disrepute within the meaning of Article 6.1, Section 4 of the Constitution of the State of Arizona.

2. Respondent's overly familiar conduct with this litigant and others before him lends an aura of favoritism to the litigant's side of any peace bond action. The Respondent's conduct in general which encourages personal contact with litigants leads to an appearance of bias on the part of Respondent toward the litigants who have such contact. The above described conduct of Judge Ackel

was a violation of Rule 45, Rules of the Supreme Court, specifically, Canons 1 and 2(a) of the Code of Judicial Conduct as amended and adopted by the Supreme Court of the State of Arizona. Such conduct is conduct which is wilful and intentional and brings the judicial office into disrepute within the meaning of Article 6.1, Section 4 of the Constitution of the State of Arizona.

Five members of the Commission recommended that Ackel be removed from his position as Justice of the Peace. Three members recommended that Ackel be publicly censured.[3]

Ackel has challenged the Commission's findings of fact, conclusions of law, and recommendation by raising the following three arguments:

1. The procedures through which the Commission reached its decision were fundamentally unfair and violated Ackel's basic right to procedural due process.

2. The Commission's amended findings of fact, conclusions of law and recommendation to the Supreme Court improperly omitted all favorable and mitigating evidence and unfairly included as "fact" complaints previously filed against Ackel.

3. The Commission's recommendation of removal from office is excessive punishment for Ackel's conduct and is unsupported by the record.

II

Ackel argues that the Commission violated his procedural due process rights by (1) using prior Commission files as an "aggravating factor" without notice to him, (2) combining investigative, prosecutorial, and adjudicatory powers in the Commission's executive director who also acted as the Commission's counsel, and (3) permitting Commission members who had not attended all of the hearings to vote.

*A. Use of Prior Commission Files.*

The Commission's Notice of Institution of Formal Proceedings dated September 17,

**3.** One member of the Commission did not participate in this matter.

1985, contained a single count charging Ackel with conduct towards Randall that demonstrated:

> a[n] intentional, consistent and persistent course of conduct which constitutes willful misconduct, persistent misconduct in office and a willful failure of Justice of the Peace FRED S. ACKEL to perform the duties required of his office, and that said course of conduct is prejudicial to the administration of justice so as to bring the judicial office into disrepute.

The notice made no mention of several prior complaints that had been filed against Ackel.

Ackel did not learn of the Commission's interest in prior Commission files until the Commission filed its initial findings of fact, conclusions of law, and recommendation on August 6, 1986. Contained therein was a finding of fact listing eight prior complaints against Ackel and their respective resolutions, and a conclusion of law stating that "[t]he Commission's continued involvement with respondent since 1980 on numerous serious complaints warrants consideration of those previous complaints in aggravation of the present matter before the Commission." [4]

Ackel contends that the Commission violated his due process rights by considering prior complaints as an aggravating factor. He relies on *Matter of Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968). In *Ruffalo*, the Ohio Board of Commissioners on Grievances and Discipline charged attorney Ruffalo with twelve counts of misconduct, including two counts of soliciting Federal Employers' Liability Act (FELA) plaintiffs as clients through Orlando, his agent. During state disciplinary hearings, Ruffalo and Orlando both testified that Orlando did not solicit clients but merely investigated FELA claims for Ruffalo. Orlando admitted, however, that he was an employee of the Baltimore & Ohio Railroad Co., an entity against whom Ruffalo's clients often filed suits. Based on this testimony, the Board amended its com-

plaint to additionally charge Ruffalo with improperly having Orlando investigate his own employer. The Board found Ruffalo guilty of seven counts of misconduct, including the newly added charge. On review, the United States Supreme Court held that amending the complaint after disciplinary proceedings had commenced to charge Ruffalo with misconduct discovered during testimony violated Ruffalo's due process rights. *Id.* at 545–47, 550–52, 88 S.Ct. at 1223–24, 1226, 20 L.Ed.2d at 118–119, 121.

■ Ackel's reliance on *Ruffalo* is misplaced. Unlike the Board in *Ruffalo*, the Commission never amended its initial complaint to add new charges.[5] Ackel's misconduct for which the Commission has recommended removal is the same misconduct charged in the Commission's initial notice. We do not believe that the Commission's use of prior Commission files violated Ackel's due process rights where the existence of the files was known both to Ackel and the Commission prior to commencement of disciplinary proceedings and the Commission used the files only as an aggravating factor and not as a new charge tacked on to an amended notice.

### B. Combination of Powers.

Edith Croxen, executive director of the Commission, also acted as counsel for the Commission in this matter. Ackel contends that combining investigatory, prosecutorial, and adjudicatory functions in an individual so closely affiliated with the Commission violated his right to a fundamentally fair trial.

■ Ackel's contention is meritless. "It is well settled by both federal and state court decisions that a combination of investigative and judicial functions within an agency does not violate due process. An agency which has only the power to recommend penalties is not required to establish an independent investigatory and adjudica-

---

**4.** The Commission deleted reference to two of the eight complaints in its amended findings of fact filed on January 16, 1987.

**5.** Ackel himself admits that "[t]he Commission never actually amended its notice." Opening Brief at 37.

tory staff." *In re Nowell*, 293 N.C. 235, 244, 237 S.E.2d 246, 252 (1977). *See also Withrow v. Larkin*, 421 U.S. 35, 46–55, 95 S.Ct. 1456, 1464–68, 43 L.Ed.2d 712, 723–25 (1975); *Matter of Zang and Whitmer*, 154 Ariz. 134, 137–138, 741 P.2d 267, 270–271 (1987); *In re Hanson*, 532 P.2d 303, 305–06 (Alaska 1975). In addition to noting that the Commission only has recommendation powers, we note that Croxen was not a voting member of the Commission in this matter. More importantly, as noted by Commission member Noel Fidel,[6] "[f]rom the time that we initiated the hearing in this matter, [Edith Croxen] has not been permitted [to participate] and ... she has not participated in the Commission's deliberations and discussions." Transcript dated January 9, 1987, at 9.

We hold that the combination of investigatory, prosecutorial, and adjudicatory functions in the Commission's executive director did not violate Ackel's due process rights.

*C. Voting Procedures.*

Two Commission members who voted for removal did not attend all of the hearings. Ackel contends that permitting Commission members who were absent from some or all of the hearings to vote violates his due process rights.

██ The general rule on voting by Commission members who have not attended all proceedings is as follows:

> The fact that absent members still voted has no bearing on the committee decision.... Reasonable familiarity and study of the transcript before making an independent decision in vote form is all that is required for due process. Actual auditory perception is not required.

*Sheffey v. Futch*, 250 So.2d 907, 910 (Fla. Dist.Ct.App.1971). This rule recognizes that lengthy hearings can present attendance problems and that it is unfair to the judge, opposing counsel, the Commission, and the public to entertain extensive delays to accommodate the schedules of every Commission member. Thus due process

does not require a voting Commission member to have a perfect attendance record. It does, however, require a voting Commission member to review transcripts of unattended hearings prior to casting his vote.

At issue in this case are the votes cast by Commission members McAuliffe and Barker. McAuliffe did not attend any of the three hearings held on March 21, 1986, December 12, 1986, and January 9, 1987. When the Commission met on January 15, 1987, to consider its findings of facts, conclusions of law, and recommendation, McAuliffe was present by telephone. He voted conditionally for removal and confirmed his vote on January 16 after being provided with and reviewing transcripts of the hearings held on December 12, 1986, and January 9, 1987. Barker attended the hearing held on December 12, 1986, but was not present at the prior and subsequent hearings. He attended the conference held on January 15 and voted for removal.

██ Although the record indicates that McAuliffe reviewed transcripts of two hearings he did not attend, the record does not indicate that McAuliffe reviewed the transcript of the hearing he missed on March 21, 1986, at which both Ackel and Randall testified. Nor does the record indicate that Barker reviewed transcripts from either of the two hearings he did not attend. Due process permitted McAuliffe's and Barker's absence from some or all of the hearings. Due process did not, however, permit McAuliffe and Barker to vote until they had reviewed transcripts from hearings they did not attend. Because of the lack of a record we must assume that these two Commission members voted prior to familiarizing themselves with transcripts of unattended hearings, and thus Ackel's due process rights were violated. The remedy for such violation is rejection of the two votes cast by McAuliffe and Barker, and the result of the remedy is that the Commission's valid votes are evenly split between removal and public censure.

---

6. During this proceeding, Fidel was a Maricopa County Superior Court judge. He currently is a member of the Arizona Court of Appeals, Division One.

## III

The gist of Ackel's second and third arguments is that the Commission systematically and deliberately slanted its findings of fact in an effort to justify its excessive and unwarranted recommendation of removal. Because the two arguments as phrased *supra* at 95 are interrelated, we will address them together in this section of the opinion.

### A. *Wilful Misconduct.*

Ackel concedes that the Commission correctly concluded that he brought his judicial office into disrepute by hugging Randall, using profanity and language with sexual overtones, requesting Randall to join him for a drink, and using overly familiar conduct with litigants. He disagrees, however, with the Commission's conclusion that such conduct was wilful misconduct.

> We have defined "wilful misconduct" as something graver than the 'lesser included offense' of 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute.' *The more serious charge should be reserved for unjudicial conduct which a judge acting in his judicial capacity commits in bad faith, while the lesser charge should be applied to conduct which a judge undertakes in good faith* but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office.

*Matter of Haddad,* 128 Ariz. 490, 497–98, 627 P.2d 221, 228–29 (1981) (emphasis added), *quoting Geiler v. Commission on Judicial Qualifications,* 10 Cal.3d 270, 283–84, 515 P.2d 1, 9, 110 Cal.Rptr. 201, 209 (1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974); *see also Matter of Walker,* 153 Ariz. 307, 311, 736 P.2d 790, 794 (1987).

Ackel justifies his conduct towards Randall by stating that he merely is a friendly judge who was attempting to put a litigant at ease. We find no fault with a judge who, under proper circumstances, acts friendly toward a litigant in an attempt to place him or her at ease. Such a demeanor is much more appreciated than one that is abrasive or pompous. We do not condone the use of profanity or sexual innuendo, however, and find that the use of such language in court or in ex parte dealings with litigants *per se* brings the judicial office into disrepute.

■ We recognize, however, that an individual's use of profanity may be a product of a habit deemed socially acceptable by a large segment of today's public, rather than the result of any ill will toward either the listener or a third person who is the subject of the discussion. We thus decline to hold that the use of profanity constitutes wilful misconduct *per se.* However, because Ackel's use of profanity to describe the absent litigant created a climate in which his impartiality must seriously be questioned, we hold that Ackel's use of profanity constitutes wilful misconduct. We cannot condemn too strongly the use of profanity which raises the specter of judicial bias and favoritism and goes far beyond a "slip-of-the-tongue" interjection of an occasional swear word into a discussion.[7]

■ We also recognize that vestiges of sexism unfortunately still exist among some male members of our society, including members of the judiciary, who manifest this trait by using such endearing terms as "darling" or "honey" when addressing a woman. Again, we do not condone such language. We decline to find that such language constitutes wilful misconduct *per se,* however, and attribute the majority of its use to ignorance, carelessness, or thoughtlessness. By no stretch of the imagination, though, can we deem Ackel's sexist conduct towards Randall the product of ignorance, carelessness, or thoughtlessness. If Ackel's comments concerning prophylactics and oral sexual practices, his invitation to Randall to join him in an out-

---

**7.** Our condemnation of language which suggests judicial partiality is not limited to profanity. Ackel's comment about getting Bankhead "in [his] clutches" clearly suggests favoritism and thus constitutes wilful misconduct.

of-court nocturnal setting, and his embrace of Randall do not constitute wilful conduct, then we are unable to envision what type of conduct falls within the rubric of the term.

We agree with the Commission that Ackel's conduct toward Randall constituted wilful misconduct.

## B. Prior Complaints as Aggravating Factor.

As mentioned *supra* at 95 the Commission listed six prior complaints against Ackel in its amended findings of fact and considered these prior complaints as an aggravating factor when making its recommendation. Ackel contends that the Commission mischaracterized the complaints as "numerous serious complaints" in its conclusion of law and also argues that the complaints are of a nature unworthy of our attention in this case.

A summary of the six complaints and their resolution follows:

1. In 1984, nine process servers complained that Ackel failed to timely issue orders on nine occasions over a three-month period. The Commission referred Ackel to the Judicial College for specific instruction on Court Administration. File remains open.

2. In 1984, an individual complained about his inability to obtain information about his case from Ackel's court clerks and also complained about the numerous trips he made to the court and the time it took to resolve his procedural problem. File remains open.

3. In 1983, a complainant felt that Ackel was predisposed regarding sentencing in a DWI matter. The complainant also objected to this statement made by Ackel to the sheriff: "Did you bring the big wagon or the small wagon?" The Commission closed this file after concluding that Ackel did not engage in conduct that would warrant censure or removal. The Commission did admonish Ackel.

4. In 1983, process servers complained that Ackel's court office was closed from 11:30 a.m. to 1:30 p.m. The court was reopened when the Commission requested a response from Ackel. File closed.

5. During a 1982 pre-trial conference conducted by Ackel in the chambers of Judge Phares (after Phares had disqualified himself) among Phares, Ackel, and the complainant-attorney, Ackel did not introduce the complainant-attorney to Phares, addressed her as "darling," and commented on her legs. The Commission strongly admonished Ackel for using sexist language and closed the file.

6. In 1980, Ackel entered default against all defendants for not answering interrogatories. The complainant-defendant was not served with the interrogatories, and his right to be heard was ignored. The Commission determined that the matter was appealable, admonished Ackel that his apparent *ex parte* granting of continuances was a matter of concern, and closed the file.

With the exception of item 5, we decline to give any consideration to the complaints for two reasons. First, in none of the five situations did the Commission believe that Ackel acted in a manner that warranted censure or removal. If the complaints were truly "serious," as the Commission has characterized them in its conclusion of law, then it should have recommended censure or removal rather than merely leaving the file open or admonishing Ackel. Second, these five complaints describe conduct that in both nature and degree of egregiousness is completely unrelated to the sexual conduct at issue here. In our opinion, these two reasons taken together justify exclusion of items 1, 2, 3, 4, and 6 from further attention.

Although the Commission did not deem Ackel's conduct described in item 5 worthy of censure or removal, conduct described therein is sufficiently similar—at least in nature, although perhaps not in degree of egregiousness—to conduct at issue in this

proceeding to justify our consideration of item 5 as an aggravating factor.

As a result of our independent review of the record, *see Matter of Biggins*, 153 Ariz. 439, 440, 737 P.2d 1077, 1078 (1987), we have concluded that the evidence establishes the existence of an additional aggravating factor not listed by the Commission in its final report. That additional aggravating factor is Ackel's regular use of endearing terms toward and physical contact with women. Pete Reinstein, Maricopa County Deputy Attorney, testified that it was not unusual for Ackel to call women "darling." Transcript dated December 12, 1986, at 45. Laurie Shanks, an attorney who had practiced in both the public and private sectors, testified that Ackel has called her "hon" or "babe" when no other attorneys were around and that he has patted her back or placed his arm on her shoulder.[8] *Id.* at 62, 68. Attorney Margaret Tinsley testified that Ackel has used such terms as "honey," "dear," and "sweetie" when addressing her and has placed his arm around her shoulder in the past. *Id.* at 83, 85. Barbara Miller, Maricopa County Deputy Attorney testified that Ackel and other Justices of the Peace have used terms of endearment when addressing her. She also testified that Ackel has never touched her. *Id.* at 111–12. Ackel's supervising clerk, Elizabeth DiFiore, testified that Ackel often hugs the clerks in his office and addresses them with endearing terms. *Id.* at 199–200.

None of these witnesses have filed a complaint against Ackel, nor did the Commission's initial Notice inform Ackel that he was being charged for such conduct. Thus under *Ruffalo* we cannot hold that the above testimony establishes an additional violation of Arizona Constitution article 6.1, section 4, or any of the canons of the Code of Judicial Conduct. *See supra* at 96. We do not hesitate to label such conduct by Ackel unprofessional and un-

called for, however, and we certainly deem it worthy of consideration as an aggravating factor in this proceeding.

We amend the Commission's findings of fact to eliminate all reference to items 1, 2, 3, 4, and 6. We agree with the Commission that item 5 can be considered as an aggravating factor. We would add as an aggravating factor Ackel's repeated use of endearing terms toward and physical contact with women. Therefore, we amend the Commission's third conclusion of law to reflect these revised findings of fact.

### C. Mitigating Evidence.

Ackel complains that the Commission deliberately omitted from its findings of fact all favorable evidence. We agree with the Commission's response that it is within the Commission's discretion to determine whether evidence presented actually mitigated Ackel's behavior and whether to include mitigating evidence in its findings of fact. Because we independently evaluate the record, however, we can disagree with the Commission's factual findings and conclude that evidence not deemed mitigating by the Commission is mitigating evidence in our opinion.

We do so here. Based on our de novo review of the record, we find as mitigating evidence the following:

1. At all times the Respondent assisted the litigant with the issuance and enforcement of the peace bond and performed his judicial duties promptly and efficiently.[9]
2. At no time during the course of Respondent's contact with the litigant did he condition the performance of his judicial duties upon receipt of a favor, personal or otherwise, from the litigant.[10]
3. Respondent has instituted a policy whereby he will not meet with a liti-

---

8. Shanks also testified that Ackel has always treated her with respect and dignity in the courtroom. Transcript dated December 12, 1986, at 63. She also testified that other Justices of the Peace use endearing terms. *Id.* at 65.

9. Transcript dated March 21, 1986, at 11, 19–20, 24, 27 (testimony of Tina Maureen Long (formerly Tina Randall)).

10. *Id.* at 24.

gant in his chambers unless a third person is present.[11]

### D. Removal or Public Censure.

We feel public censure is more appropriate than removing Ackel from office. Our decision is premised on the following considerations. First, only three of the six Commission members who either attended or reviewed transcripts from all of the hearings recommended removal. Second, despite Ackel's repeated sexist treatment of women, the record does not indicate that Ackel ever conditioned his performance on the return of favors, sexual or otherwise.[12] Third, Ackel has instituted corrective procedures in his court to reduce the possibility of a recurrence of an incident such as the one in issue. Finally, we feel that as a result of these proceedings respondent will most likely comport himself in the future in compliance with the Canons of Judicial Conduct. By publicly censuring Ackel rather than removing him, we in no way discount the seriousness of Ackel's conduct. If he fails to mend his ways and finds himself again before this tribunal on similar charges, the above considerations will not save him twice.

### IV

We hereby formally and publicly censure Fred S. Ackel for reasons given herein. We adopt the Commission's recommendation that Ackel be assessed attorneys' fees and costs in the amount of $2207.07 pursuant to Rule 4(D), Rules of Procedure for the Commission on Judicial Qualifications, 17A A.R.S.

GORDON, C.J., and HOLOHAN and MOELLER, JJ., concur.

NOTE: Justice JAMES DUKE CAMERON recused himself and did not participate in the determination of this matter.

FELDMAN, Vice Chief Justice, dissenting.

I agree with the majority's analysis and its conclusions, except for the ultimate conclusion regarding the proper sanction.

My disagreement is based upon a slightly different view of the ultimate inference to be drawn from the evidence. As the majority notes, we are the ultimate judges of fact and law. At 99. I do not see this as just a case of sexual harassment which will probably not be repeated. I find an even more serious type of corruption in this case. The respondent obviously sought sexual favors from Ms. Randall and made it quite clear that although nothing was demanded of her, complaisance would bring judge and litigant to an even better working relationship. Together, the judge and Ms. Randall would work to "get the son of a bitch." The problem, of course, is that the "son of a bitch" in question was the other party to the litigation before the judge.

This, I believe, is not just partiality or sexual harassment, bad as they may be. It amounts to a solicitation of favors for the dispensation of justice. In my view, it makes no difference whether the judge solicits sexual favors or a few dollars as acknowledgment of past or future judicial service. Such solicitation is corrupt and indicates a temperament unfit for judicial office. Removal is the appropriate sanction in this case.

---

11. *Id.* at 49 (testimony of Ackel); Transcript dated December 12, 1986, at 200–01 (testimony of Elizabeth DeFiore, Ackel's supervising clerk).

12. "In extreme cases, sexual harassment represents an attempt to use one's judicial office to obtain sexual favors. Such conduct indicates not only lack of respect for public trust, but also an availability for improper influence." Lubet, *Judicial Impropriety: Love, Friendship, Free Speech, and Other Intemperate Conduct,* 1986 Ariz.St.L.J. 379, 398 (1986). *See e.g. In re Hammond,* 224 Kan. 745, 585 P.2d 1066 (1978); *In re Martin,* 302 N.C. 299, 275 S.E.2d 412 (1981); *In re Kivett,* 309 N.C. 635, 309 S.E.2d 442 (1983).