701 P.2d 841

**In re the Matter of Cheryl K. HEN-DRIX, Judge of the Superior Court, Maricopa County, Arizona.**

No. JUD–8.

Supreme Court of Arizona,
In Banc.

June 24, 1985.

O'Dowd, Burke & Lundquist, P.C. by Bruce A. Burke, Tucson, for Comm'n on Judicial Qualifications.

Lewis & Roca by Roger W. Kaufman and David J. Cantelme, Phoenix, for respondent.

CAMERON, Justice.

The commission on judicial qualifications recommends that respondent, Cheryl K. Hendrix, be publicly censured for misconduct while acting in her official capacity as a judge of the Superior Court of the State of Arizona in and for the County of Maricopa. We have jurisdiction pursuant to Art. VI.I, § 4, of the Arizona Constitution.

The facts necessary for a determination of this matter are as follows:

Respondent Cheryl K. Hendrix graduated from law school in 1971 and entered practice with a Phoenix firm. In 1981, she was appointed to serve as a Superior Court Commissioner. Subsequently, in March 1982, she was appointed a Judge of the Superior Court for Maricopa County. In May 1983, Judge Hendrix was assigned to the Criminal Division of that Court.

## COUNT I

From May to October 1983, Ms. Brenda Barnes, a Deputy Maricopa County Superior Court Clerk, was assigned to Judge Hendrix's court. Barnes' duties consisted of such matters as swearing in witnesses, maintaining exhibits, preparing minute entries and transcribing orders entered by the judge.

Prior to the time that she served in Judge Hendrix's court, Barnes had served in the same capacity in another court where she became acquainted with Robert Tuzon. Tuzon had been convicted of second degree murder. At the time of his murder conviction, Tuzon was on probation as a result of an earlier plea of guilty to a burglary charge. This murder conviction caused his probation to be revoked. He was sentenced to serve a term of two and one-half years on the burglary conviction, which was to run concurrently with the sentence of 20 years to life for murder. His conviction and probation revocation were affirmed by this Court on appeal. *See State v. Tuzon*, 118 Ariz. 205, 575 P.2d

1231 (1978). Tuzon's murder sentence was later commuted to ten years to life as a result of information he provided to state authorities in another case.

In December, 1982, and again in May of 1983, Tuzon filed petitions for post-conviction relief. The matters were assigned to Maricopa County Superior Court Judge David D. Derickson. Tuzon, pursuant to his request, represented himself in these various post-conviction matters with William Friedl, Esq. serving as advisory counsel. To allow Tuzon to be present at his various hearings, he was transferred from the Arizona State Prison at Florence and housed temporarily at the Maricopa County Jail.

As a result of her contact and acquaintance with Tuzon, Barnes became convinced that he had been treated unfairly by state authorities. She began assisting him in the filing of legal papers in the post-conviction proceedings. Records of the Maricopa County Jail reflect that Barnes visited Tuzon on seven occasions in June and twelve in July. On each occasion, she listed herself as a friend and provided her home address. The visits were held in the jail's regular visitor's room. This "room" is a 10 foot corridor inside the jail that is partitioned down the middle by a sheet of glass. A prisoner receiving a visitor sits on one side of the partition and views his visitor on the other side. The parties communicate by means of an intercom telephone system. Visits were limited to three general visits per week, of thirty minutes' duration.

After her initial visits with Tuzon, several jail guards, according to Barnes, began to call her derogatory and vulgar names. Also, during these visits, Tuzon indicated to Barnes that he believed that certain of his legal papers were not being filed by the jail legal staff. Based on this, Barnes took it upon herself to personally file his papers in these matters.

On or about 9 August 1983, Barnes approached Judge Hendrix in chambers regarding Tuzon. Barnes reported to Judge Hendrix the difficulties she and Tuzon were having regarding the filing of his legal papers, and Barnes further complained of the name calling by guards that she was experiencing when she visited the jail. Barnes then asked Judge Hendrix for an order to deal with the name calling and to facilitate the filing of Tuzon's papers. Judge Hendrix agreed to consider such an order, and asked Barnes to prepare one. Barnes drafted and presented to Judge Hendrix an order, which read as follows:

IT IS ORDERED that Brenda Barnes, Deputy Superior Court Clerk, Maricopa County, shall be permitted to have legal visits with Plaintiff Robert V. Tuzon at the Maricopa County Jail during regular times that the jail is not secure for the purpose of assisting him in his pro se litigations effective for the duration that Mr. Tuzon is in the Maricopa County Jail.

Judge Hendrix considered the order in chambers ex parte without calling for or reviewing Tuzon's files. Although Judge Hendrix was aware that Tuzon's matters were not assigned to her division, she, nevertheless, on 9 August 1983, signed the order. The order was not endorsed (copied) to the Maricopa County Attorney or to Judge Derickson.

The 9 August order granted Barnes the status of a "legal" or "privileged" visitor to Tuzon. Legal or privileged visits did not count against the regular visit allotment, and were not limited in number or duration. Legal visits also took place in an attorney conference booth which allowed for personal contact between the prisoner and the visitor. Barnes was, therefore, able to visit Tuzon face to face without time limit in the lawyer's visiting area. Jail records show that Barnes made twenty visits to Tuzon in August, pursuant to her status as a privileged or special visitor. During these visits, Barnes listed herself as a Court Clerk and gave the courthouse as her address.

Later in August, Barnes again approached Judge Hendrix and asked her to sign a second order allowing Tuzon to use the telephone at the jail to make calls during times not normally permitted by jail personnel. Judge Hendrix indicated she

would be willing to sign such an order, and Barnes prepared a minute entry order dated 29 August 1983, which she presented to Judge Hendrix. Again, Judge Hendrix did not review the files in the cases before signing the order and the order was not endorsed to the Maricopa County Attorney or Judge Derickson.

The order authorized Tuzon to use the jail telephone between 5:00 and 6:00 p.m. and 9:30 and 11:00 p.m., Monday through Friday, hours when Tuzon would not ordinarily have been permitted to do so. Judge Hendrix was aware that Barnes' requested authorization of phone calls between 5:00 and 6:00 p.m. allowed Barnes to receive telephone calls from Tuzon at the courthouse, after court closing time. The hours of telephone usage permitted by the order were more extensive than those granted almost simultaneously by Judge Derickson.

On 6 September 1983, Tuzon filed a motion requesting that his cases be permanently assigned to Judge Hendrix. Judge Hendrix declined to act on this request. At this time, the Clerk of the Superior Court terminated Barnes as deputy. Judge Hendrix wrote a letter of protest to the Clerk ending with the statement:

Personally and professionally, I find the action taken by your department with regards to Brenda's termination to be unwarranted and poorly handled.

At the hearing on the matter, the Presiding Criminal Judge of the Maricopa County Superior Court, testified that it was highly unusual for a judge to enter an ex parte order in a criminal case not assigned to that judge, and that though he and other judges have entered ex parte orders pertaining to various subjects, the orders of 9 and 29 August did not fit into any category or type of order he had seen before. He also indicated that he had never seen an ex parte order permitting a clerk to visit an inmate as a legal or privileged visitor.

The Presiding Criminal Judge also noted that although judges may enter orders in matters not assigned to them, this is generally done when the judge to whom the matter is assigned is unavailable. In such cases, the practice is to endorse a copy of the order entered to the judge to whom the matter is assigned. There has been no showing that Judge Derickson was unavailable to consider the matter covered by the 9 and 29 August orders. Judge Hendrix acknowledges that she signed the order of 9 August, in part, to help Barnes curtail the name calling by the guards. Judge Hendrix also acknowledges that this order was signed, in part, because Barnes was Judge Hendrix's "own" clerk, and that she would not have signed such an order for others. She further acknowledges that the order gives the appearance of granting a special favor to Tuzon.

After deposition and hearing, the commission on judicial qualifications found that the evidence of willful misconduct in office which "implies or requires actions taken in bad faith, contrary to law or in conscious excess of jurisdiction, or for a corrupt or improper motive" was not clear and convincing. The commission did find, however, that:

Conduct prejudicial to the administration of justice may include conduct undertaken in good faith but which nevertheless appears to be unjudicial and/or prejudicial to public esteem for the office.

It also found that:

The entry by Judge Hendrix of the Orders of August 9 and August 29, 1983 have both the appearance and the reality of granting to Judge Hendrix' court clerk, Ms. Barnes, and to Mr. Tuzon special privileges in visitation and telephone usage rights.

This is compounded by the fact that the orders were entered by Judge Hendrix ex parte, at the request of only her court clerk, and in matters technically within her jurisdiction but not assigned to her. These Orders of August 9 and 29, 1983 have the appearance of impropriety and constitute an abuse of the powers of the judicial office.

Judge Hendrix' conduct, as described above, violates Canons 1, 2, and 3 of the Code of Judicial Conduct as amended and

adopted by the Supreme Court of the State of Arizona.

Judge Hendrix' conduct, as described above, constitutes conduct which is prejudicial to the administration of justice, and this conduct brings her office into disrepute within the meaning of Article 6.1, Section 4 of the Constitution of the State of Arizona.

We agree with both the commission's conclusions of law and its findings of fact.

Our constitution reads as follows:

Section 4. On recommendation of the commission on judicial qualifications, the Supreme Court may * * * censure or remove a judge for action by him that constitutes * * * conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

Art. VI.I, § 4, Arizona Constitution.

The Code of Judicial Conduct as adopted by this Court, Rule 81, Rules of the Supreme Court, reads in pertinent part:

### Canon 1

**A Judge Should Uphold the Integrity and Independence of the Judiciary**

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

### Canon 2

**A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities**

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.

### Canon 3

**A Judge Should Perform the Duties of His Office Impartially and Diligently**

The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. * * *

■ In acting upon the recommendation of the Arizona commission on judicial qualifications, we are required to make an independent and de novo determination of both the facts and the law. *Matter of Haddad*, 128 Ariz. 490, 627 P.2d 221 (1981). *See also In re Cieminski*, 270 N.W.2d 321 (N.D.1978). We will, however, give serious consideration to the findings of the commission. Haddad, *supra*.

■ From a review of the record in this case, we agree with the commission that the conduct of Judge Hendrix violated the Canons of Judicial Conduct, Rule 81, Rules of the Supreme Court, and particularly Paragraph B of Canon 2 which proscribes conduct that lends the prestige of the judicial office to the private interest of others or conveys to the public that others are in a special position to influence the judge. The actions of Judge Hendrix did just that. Her clerk was given special privileges not accorded to others. She obtained these privileges and favors only because she had access to the judge—access not available to other non-lawyers. This conduct did not "promote public confidence in the integrity and impartiality of the judiciary" as required by Canon 2.

We agree also with the commission that the conduct was not "willful conduct in office" as specified in Art. VI.I, § 4, of the Arizona Constitution. Instead, we believe Judge Hendrix's conduct violated the lesser standard of "conduct prejudicial to the ad-

ministration of justice that brings the judicial office into disrepute." Art. VI.I, § 4. It was, at best, a series of thoughtless acts by a judge who had apparently forgotten the position she held and consequences of her actions. It was careless but not corrupt. We find as to Count One that the respondent violated the Canons of Judicial Conduct and the Arizona Constitution Art. VI.I, § 4.

## COUNT II

In August of 1983, in the case of *State v. Leo Strange*, the defendant was found guilty of the crime of attempted robbery.

The facts presented at time of trial indicate that the defendant approached the cashier at a convenience market for the ostensible purpose of purchasing a can of pork and beans, and that he paid for them. The defendant then unsuccessfully attempted to force the cashier to turn over the money in the cash register. The defendant left without his can of beans.

Prior to sentencing, Judge Hendrix purchased a can of beans and brought them to the courtroom. After pronouncing the sentence, Judge Hendrix made the following remarks to the defendant as he stood before her in open court:

> Mr. Strange, after hearing the testimony that was produced at the trial of this matter, I find that you have suffered some inequities in this case. You put your money on the counter and left without your beans. I have got permission from the deputy and from the custodian to make sure this is put in your property locker for you to take with you. I wanted to make sure you didn't get shortchanged, but I am afraid I paid a little bit more than 40 cents for yours. The deputy will have this in the property locker for you. I hope you enjoy them, sir.

As she made these remarks, she handed Strange the can of beans. The defendant, *Strange*, filed an appeal and Robert Ferrara, Judge Hendrix's court reporter, prepared the transcript for the appeal. Ferrara was uncertain whether to include Judge Hendrix's comments concerning the can of beans, as well as another side remark by Judge Hendrix. Ferrara contacted Judge Hendrix on the subject, and she told him it was his decision whether to include these matters or not.

Ferrara did not include in the sentencing transcript Judge Hendrix's comments on the can of beans and told Judge Hendrix that he had deleted the can of beans incident.

The commission found:

> Judge Hendrix' comments to Mr. Strange in open court, as described above, were indecorous and impertinent, and her conduct and comments detracted from the dignity of the proceedings over which she presided.

> Mr. Strange had a constitutional right to a complete and accurate transcript of the sentencing proceedings. See *Griffin v. Illinois*, 351 U.S. 12 [76 S.Ct. 585, 100 L.Ed. 891] (1956).

The commission further found, as to Count II, Judge Hendrix's conduct violated Canons 1, 2, and 3 of the Code of Judicial Conduct and was conduct which was prejudicial to the administration of justice and brought her office into disrepute within the meaning of Art. VI.I, § 4, of the Constitution of the State of Arizona.

We must admit that we are puzzled by the "can of beans" statement. We have tried to discern from the judge's remarks a moral lesson or message that she might have been trying to impart to the defendant. We are unable to discern any such message. The respondent judge, however, compounded her action by allowing the court reporter to delete this and other matters from the trial transcript. This further violated the Code of Judicial Conduct, particularly Canon 1, Judicial Integrity, and Canon 2, Impropriety or Appearance of Impropriety. By allowing these items to be omitted from the reporter's transcript, Judge Hendrix gave the appearance of trying to hide something. This is contrary to both the sound administration of justice and the Canons of Judicial Conduct. It is noted that since these proceedings, Judge

Hendrix has ordered Ferrara to transcribe all proceedings verbatim, and not to delete anything.

We note that at the time of the incidents in this case, Judge Hendrix had been a superior court judge for less than two years. We note also that Judge Hendrix is capable of properly conducting judicial matters brought before her. We have recently affirmed a complex murder conviction tried in her court. *See State v. Via,* 146 Ariz. 108, 704 P.2d 238 (1985). We believe public censure in this case is the appropriate sanction for the conduct described.

The respondent, Judge Cheryl K. Hendrix, is hereby publicly censured.

GORDON, V.C.J., and HAYS and FELDMAN, JJ., concur.

NOTE: Chief Justice WILLIAM A. HOLOHAN did not participate in the determination of this matter.