867 P.2d 853

**In re the Matter of Vinton M. PECK, Justice of the Peace, Apache Junction, Pinal County, State of Arizona.**

**No. JC–93–0001.**

Supreme Court of Arizona,
En Banc.

Feb. 3, 1994.

---

Harriet L. Turney, Chief Bar Counsel, Phoenix, for State Bar of Arizona.

Vinton M. Peck, pro se.

## OPINION

FELDMAN, Chief Justice.

This is a judicial disciplinary proceeding in which we consider the recommendations of the Commission on Judicial Conduct (Commission). We have jurisdiction under Ariz. Const. art. 6.1, §§ 2, 3, and 4 and Rule 11, Rules of Procedure for the Commission on Judicial Conduct.

■ The Commission is a constitutional public body that investigates and, after hearings, makes findings and recommends disposition of judicial disciplinary cases.[1] *See*

1. The Commission is composed of two lawyers, two appellate judges, two superior court judges, one justice of the peace, one municipal court judge, and three public members. Ariz. Const. art. 6.1, § 1.

Ariz. Const. art. 6.1; *In re Haddad,* 128 Ariz. 490, 491–92, 627 P.2d 221, 222–23 (1981). This court then independently reviews the record and acts as the final judge of law and fact. *In re Ackel,* 155 Ariz. 34, 42, 745 P.2d 92, 100 (1987); *Haddad,* 128 Ariz. at 491, 627 P.2d at 222.

## PROCEDURAL BACKGROUND

Vinton M. Peck (Respondent) had been in the contracting business for some thirty years before being elected Apache Junction's justice of the peace in November 1990. Respondent is not an attorney and has little or no legal training. Subsequent to his election, but before taking office, he attended the required orientation and training programs this court requires of newly elected limited jurisdiction judges. *See* Ariz.Sup.Ct.Admin.Order 90–28; Ariz.R.Sup.Ct. 81.

In the current proceedings, following a hearing at which Respondent represented himself, the Commission found that Respondent violated numerous ethical rules and recommended a public censure and a thirty-day unpaid suspension. The Commission also recommended that Respondent spend two weeks observing other courts as part of a continuing education program and attend the new judges' orientation program again, at his own expense.

Respondent petitioned for review of the Commission's findings and recommendations, again appearing *pro se.* He does not dispute the findings of fact but objects to the Commission's conclusions and recommended sanctions, arguing that they are too harsh in relation to his conduct.

## FINDINGS OF FACT

Four incidents form the basis of Respondent's present judicial misconduct charges:

### A. Count I—Louis Gorenc (Case No. 91–CJC–041)

Louis Gorenc opposed Respondent in the election for justice of the peace. While campaigning, two of Respondent's friends, as complaining witnesses, made allegations that resulted in criminal charges being filed against Gorenc. A pro tem justice of the peace dismissed these charges after the primary election. About three weeks after the general election, Respondent, by then sworn and acting as justice of the peace, reinstated the charges. He concluded there was "reasonable cause" (*see* Ariz.R.Crim.P. 3.1(a)), decided the matter should be pursued, and signed and issued a summons requiring Gorenc to appear in his court. Respondent, who had not recused himself, apparently intended to preside over the proceedings against his former opponent. However, Gorenc filed a motion for change of judge claiming bias and prejudice. Ariz.R.Crim.P. 10.1. Respondent granted the motion.

Respondent agrees in hindsight that he improperly issued the summons. However, he blames this on lack of judicial experience and unfamiliarity with the rules of judicial conduct. He also states that he was very busy the day he signed the summons and that his clerks told him the "best way for [him] to get out of that, is just wait for [Gorenc's] move." Reporter's Transcript, Mar. 17, 1993 (R.T.), at 27.

### B. Count II—Clinton Doan (Case No. 92–CJC–017)

On January 5, 1992, Respondent was assigned to preside over *State v. Doan.* Doan had been charged with burglary and attempted theft. At the time, another judge had already concluded Doan's bond hearing and set his bail. Shortly after the hearing, Respondent met privately with members of Doan's family and his employer. Respondent does not explain how the meeting came about, although its purpose was supposedly to discuss reducing the bond amount. During the meeting, someone suggested to Respondent that Doan had been mistakenly identified as the perpetrator. Respondent then telephoned the investigating police officer, telling him that members of Doan's family had given him strong reason to believe this was a case of mistaken identity. Because of these two *ex parte* conversations, the Pinal County Attorney's Office requested a change of judge, which Respondent granted.

Respondent claims he was concerned because unprocessed paperwork prevented Respondent from appointing counsel. Because of this alleged concern for Doan's rights, Respondent discussed reducing the bond with Doan's family and employer. Respondent agrees that his conduct was improper but again blames his ignorance. He also complains that "too much of this practice is standard to our local jurisdiction," R.T. at 33, suggesting it is common practice for justices of the peace to converse *ex parte* with police and parties about pending matters. Although we hope the claim is unfounded, other cases suggest, unfortunately, that this may occur all too often. *See, e.g., In re Gumaer,* 177 Ariz. 280, 282, 867 P.2d 850, 852 (1994).

### C. Count III—Mary McConnell (Case No. 92–CJC–018)

Mary McConnell and her husband lived in Apache Junction and published a weekly area newspaper. Respondent advertised in this newspaper during his campaign. The McConnells also leased office space in a building owned by Respondent and his wife, but after three months the McConnells had paid no rent and vacated the office. In January 1992, Respondent issued a summons on an unrelated criminal complaint against Mary McConnell. At that time, he claimed the McConnells owed him about $300 in unpaid rent, plus damages for breaching the lease. At some later date, Respondent realized his involvement in this case was improper and in February 1992, *sua sponte* recused himself from the case.

### D. Count IV—Robert James (Case No. 92–CJC–054)

In October 1990, before the election, Robert James filed a criminal complaint against Respondent, accusing him of fraudulently registering to vote in violation of A.R.S. §§ 16–182(A) and 16–184(A). The Department of Public Safety investigated but filed no charges against Respondent.

On April 2, 1992, Respondent presided over the case of *Wentz·v. James,* a landlord-tenant dispute. Although the defendant in *Wentz* was the same person who had filed the complaint against him, Respondent never disqualified himself from hearing the case and eventually entered judgment against James.

The facts summarized above are contained in the Commission's findings, are supported by the record, and are not in dispute. We accept the Commission's findings.

## CONCLUSIONS OF LAW

█ The Commission found that Respondent's conduct in these four incidents violated Canons 1, 2(A), 2(B), 3(A)(4), 3(C)(1)(a), and 3(C)(1)(c) of the Code of Judicial Conduct (the Code) contained in Ariz.R.Sup.Ct. 81.[2] Conclusions of Law at 6. The Commission also found that his conduct was "prejudicial to the administration of justice that brought his office into disrepute within the meaning of Article 6.1, Section 4 of the constitution of the State of Arizona." *Id.*

The facts plainly show that Respondent violated the Code in the *Doan* matter. Respondent twice engaged in significant *ex parte* communications, first with the litigant's family and friends and then by arguing on their behalf with a law enforcement official. As the Commission concluded, this clearly violates Canon 3(A)(4), which provides that "[a] judge should ... neither initiate nor consider ex parte applications concerning a pending or impending proceeding."

In the counts involving Gorenc and James, the Commission concluded that Respondent failed to disqualify himself in cases in which his "impartiality might reasonably be questioned" because of his "personal bias or prejudice concerning a party." Canon 3(C)(1). We believe these conclusions are correct. Impartiality may be reasonably questioned when a judge presides over prosecutions based on the complaint of the judge's friends or brought against the judge's former opponent in a bitterly contested election. The

<hr/>

2. The Commission filed these charges against Respondent in 1993. Therefore, we cite the Code as it existed in 1993. We note, however, that the Code, while still in the same form, was subsequently renumbered in 1994.

same may be said when the judge presides over a civil case in which one of the litigants previously brought criminal charges against the judge. Surely, legal training or not, Respondent must have known that he could easily be suspected of using his office to "get even."

In the McConnell matter, Respondent acted in a judicial capacity while, at the same time, he claimed that one of the litigants was personally indebted to him. This violated Canon 3(C)(1)(c), which states that a judge should disqualify himself if he "knows that he ... has a financial interest in the subject matter in controversy or in a party to the proceeding." Nor was it necessary for Respondent to engage in difficult interpretation of the Code. Surely, a judge's impartiality might reasonably be questioned when he sits in judgment on those who owe him money. Specific admonitions are applicable to these counts. *See* Canon 3(C)(1)(a) (disqualification for personal bias); 3(C)(1)(c) (disqualification when judge has a financial involvement).

Under the facts, there is no doubt that the Commission's legal conclusions are correct. We accept and adopt them. We turn, therefore, to sanctions.

### THE SANCTION

#### A. THE NATURE OF THE MISCONDUCT

We do not lightly undertake the difficult task of disciplining lawyers and judges. Our goal is not to punish but, rather, to impose sanctions to protect the public and foster judicial integrity. *Haddad,* 128 Ariz. at 492, 627 P.2d at 223. Imposition of proper and proportionate sanctions serves dual purposes. It deters similar conduct by others and, as a result, fosters public confidence in our self-policing system. Only in this way can we ensure judicial integrity and preserve judicial independence. We therefore must examine Respondent's conduct in light of its harm to the public and its impact on the perceived integrity of the judicial system.

To determine a sanction that is both proper and proportionate, we believe it is helpful to compare this case with prior judicial misconduct cases. In *In re Marquardt,* 161 Ariz. 206, 778 P.2d 241 (1989), a superior court judge was convicted of the misdemeanor crime of possession of marijuana. The misconduct did not involve the judge's performance of his judicial duties, and he had no prior disciplinary record. *Id.* at 213, 778 P.2d at 248.. We suspended the judge without pay for one year. Later, after the judge was charged with a felony involving marijuana, he resigned from the bench in lieu of removal and was disbarred. *In re Marquardt,* 169 Ariz. 500, 821 P.2d 161 (1991); *State v. Marquardt,* Maricopa County Superior Court case No. 91–04596, June 6, 1991 (plea agreement).

In *In re Lehman,* 168 Ariz. 174, 812 P.2d 992 (1991), a justice of the peace used foul language, made derogatory sexual comments, and carried on a profane and abusive conversation with a law enforcement officer in his courtroom. Comparing Judge Lehman's conduct with that of Judge Marquardt, this court stated, "[i]n the present case, we deal with something more serious—misconduct constituting abuse or corruption of the office itself." *Id.* at 176, 812 P.2d at 994. *Cf. Gumaer,* 177 Ariz. at 282, 867 P.2d at 852. Because Judge Lehman's misconduct occurred in the courtroom rather than in his private life, we would have suspended or removed him from office. However, his case reached this court after his term of office had expired; therefore, the only sanction available to the court was public censure. *Id.*

In another judicial misconduct case, *In re Anderson,* 168 Ariz. 432, 814 P.2d 773 (1991), we again elaborated on the judge's serious misconduct in the performance of judicial duties. The charges against Judge Anderson were similar to those against Respondent: *ex parte* conversations and failure to recuse. We concluded that "[r]espondent's misconduct *in office* manifests contempt for a fundamental right our system holds dear: the right to have one's day in court before an impartial tribunal." *Id.* at 435, 814 P.2d at 776 (emphasis added).

In *Anderson,* as in *Lehman,* the court's choice of sanctions was limited to censure because the case reached us after Judge Anderson's term expired. *Id.* We stated,

however, that we considered the conduct so serious that we did not believe it "proper to simply administer a public censure without some explanation." *Id.* We followed with this comment:

> As in *Lehman,* respondent has committed serious judicial misconduct that constitutes abuse or corruption of the office itself. Absent the most significant mitigating circumstances, this court would not approve a mere public censure as the proper discipline for the abuse of office shown here. As noted, however, respondent does not hold office [any longer] and cannot be suspended or removed. Accordingly, we accept and approve the Commission's recommendation that respondent be publicly censured.

*Id.* at 436, 814 P.2d at 777.

These comments from *Lehman* and *Anderson* direct our course in the present case. Respondent's term has not expired, and the case has reached us in time for appropriate action. Here, as in *Lehman* and *Anderson,* we find that the *ex parte* contacts and Respondent's failure to recuse himself constitute abuse or corruption in the performance of judicial duties and threaten our citizens' rights to their "day in court before an impartial tribunal." *Id.* at 435, 814 P.2d at 776.

■ As we stated in *Lehman* and *Anderson,* our first and most important inquiry is the judge's conduct in the performance of his or her office. We must treat official conduct even more strictly than improprieties in a judge's private life because it goes to the very integrity of our judicial system. Thus, absent significant mitigation, suspension or removal is the only proper sanction for repeated and serious misconduct.

## B. MITIGATION

Respondent, a non-lawyer, attributes his improprieties to his short tenure in office and ignorance of the law, arguing that he did not knowingly violate the Code. Because all of the misconduct occurred within his first two years on the bench, he says he had no chance to learn the basic rules or the Code. Thus, he submits, the Commission's recommended thirty-day suspension is too severe. Even assuming Respondent acted through ignorance rather than malice, we disagree. Respondent's ignorance of the law might constitute mitigation if, lacking a formal legal education, Respondent had violated one of the Code's obscure or technical provisions.

■ In this case, however, the violations are far from technical. It requires only basic instincts of fairness to realize that one should not judge cases involving personal friends, enemies, or debtors. In any event, such matters were covered in Respondent's judicial orientation.[3] Thus, we cannot accept a defense of judicial unfamiliarity with basic rules of ethical conduct. To do so would reward professions of ignorance of rules of fairness and propriety. Only one precept is possible—*all* judges, law trained or not, elected or appointed—must learn the Code. They must read it, refer to it when in doubt, seek advice when there is any question, and resolve questions in favor of compliance. Common sense, or even a cursory reading of the Code, would make any reasonable adult understand that judges must be, and appear to be, impartial. An *ex parte* meeting with one side in a criminal proceeding, not to mention advocating that side's position, is an impropriety going to the heart of the adversarial system.[4] Arizona law does not require that justices of the peace be attorneys. *See*

---

3. Review of the records of our administrative office is instructive. *See* Ariz.R.Evid. 201(b)(2). The new judges' orientation agenda establishes that between the initial orientation in December 1990 and the follow-up in April 1991, Respondent received over two full days of instruction devoted to judicial ethics. Respondent also testified before the Commission that he attended almost every educational session available to him. R.T. at 21.

4. Examination of the transcript of Respondent's telephone call to the detective in the *Doan* case is instructive. *See* Transcript of Recording made by Apache Junction Police, January 7, 1992. Respondent did not just call the detective about an administrative matter. Even after the detective expressed concern about the impropriety of the *ex parte* conversation, Respondent went on to argue on Doan's behalf, telling the detective that this might be a case of "mistaken identity," and that "these one-on-one I.D.'s ... are not as good as what they oughta be." *Id.* at 2.

*Crouch v. Justice of Peace Ct.,* 7 Ariz.App. 460, 465, 440 P.2d 1000, 1005 (1968); Op. Atty.Gen. No. 75–1 at 25, 1975–76. All judicial officers, whether lawyers or non-lawyers, are held to the same standards of integrity.[5]

Finally, at the Commission hearing, Respondent repeatedly blamed the "system" for his woes. He complained that he lacked proper training, he had no one to consult, and he had no time to learn the rules of judicial conduct. We are unpersuaded. Respondent received the same training as all other new judges, including justices of the peace. Respondent was assigned a mentor judge to help him learn proper procedure. R.T. at 20. He also had an experienced superior court presiding judge of his county to whom he could have turned for advice. *Id.* at 23. Yet, in every instance Respondent failed to ask anyone about the proper course.

Respondent admitted that he had a copy of the Code but never really read it. *Id.* at 19. Respondent should have read and familiarized himself with the basic rules of judicial conduct between his November election and taking the bench in January, if not earlier. If he had trouble understanding the Code, he should have asked for guidance. Thus, we conclude that if Respondent's conduct was not knowing or intentional, it was certainly willful. *See* Ariz. Const. art. 6.1, § 4; *see also Lehman,* 168 Ariz. at 176, 812 P.2d at 994 ("this court is empowered to discipline judges for conduct that 'constitutes willful misconduct in office....'" (quoting Ariz. Const. art. 6.1, § 4)).

We presume Respondent campaigned as a person competent to perform the duties of office and did not warn the voters that he would not familiarize himself with the Code until some indefinite time after assuming office or only after a lengthy learning period. Those who voted him into office had a right

to expect a judge with basic competency and integrity from the start. In sum, we find Respondent's mitigation argument entirely unpersuasive.

## C. AGGRAVATION

■ We must also consider any aggravating factors indicating that the public and the judiciary need protection from Respondent. *Cf. Marquardt,* 161 Ariz. at 212, 778 P.2d at 247. Recently, we suspended a justice of the peace for ninety days for conduct arguably more severe than that in the present case. *See Gumaer,* 177 Ariz. at 280–81, 867 P.2d at 850–851. Judge Gumaer, however, had a clean disciplinary record. We stated that the sanction would have been much more stringent had he been previously censured or suspended. *Id.* at 283, 867 P.2d at 853.

During Respondent's eventful judicial tenure, the Commission has reprimanded him once (Case No. 91–CJC–031) and admonished him twice (Case Nos. 91–CJC–054 and –121).[6] We believe these sanctions should have alerted Respondent to his errors. Three of the four current charges occurred within months after Respondent was reprimanded by the Commission. Yet he continued to act improperly without ever seeking self-improvement or help. We conclude that Respondent's continued failure to exercise caution, even after earlier sanctions, is a strong aggravating factor.

We are also dismayed by the tone and substance of Respondent's communications to the court. Although we denied Respondent's motion to file a cross-complaint against the Commission, he nevertheless submitted a rambling, incoherent, twenty-two page document accusing the judiciary of persecuting him. Respondent made wild, unsubstantiated claims of conspiracy and revenge. To cite but a few examples, Respondent accused

5. Respondent recommends that limited jurisdiction, non-lawyer judges be subject to a lighter enforcement standard than other judges. We not only dismiss this suggestion but seriously question Respondent's judgment in proposing it.

6. Respondent was reprimanded for continuing to serve as a precinct committee member after his election as a justice of the peace. His first admonishment was for releasing a rape suspect because he did not think the crime was heinous

enough to require bond. His second was a result of improper comments made to a litigant in a domestic dispute case.

Respondent received the reprimand and one admonishment on August 16, 1991. He received the second admonishment on April 22, 1992. The first two sanctions were delivered five months before Respondent committed three of the four acts he is now charged with.

Commission members—who had shown some leniency by recommending only a thirty-day suspension—of "academic snobbery and hypocrisy," stating that they acted only because they believed "the Judge to be a dangerous sort of person who would rip away their positions," and claiming that their retaliatory actions were *"CORRUPTION* of their office." Respondent's Cross Complaint, Counts 14 and 17 (emphasis in original). Finally, Respondent accused the Commission of collusion, suppressing dissent, and of furthering its own agenda. *Id.* at Counts 19 and 20. These charges have neither credibility nor factual support and will not be addressed.

Respondent's accusations only confirm that he lacks the judgment needed to carry out his duties competently. Respondent blames the world for his troubles, refuses to see his own shortcomings, and, consequently, does nothing to cure them. We take this as some indication that no amount of rehabilitation or education will solve these problems and that Respondent poses a danger of committing future violations bringing the judiciary into disrepute.

### D. DISPOSITION

■ The Commission recommends that we suspend Respondent for thirty days. Respondent suggests an informal censure, participation in the next new judges' orientation at his own expense, and a one-day paid suspension. Our organic law empowers us to censure, suspend, or remove a judge, and gives us the ultimate authority to determine the proper sanctions. *See* Ariz. Const. art. 6.1, §§ 3 and 4; *see also Haddad,* 128 Ariz. at 491, 627 P.2d at 222 ("the burden of

imposing the sanction is put squarely on the Supreme Court; the Commission has power only to recommend." (quoting *In re Heuermann,* 90 S.D. 312, 240 N.W.2d 603, 606 (1973))).

■ Our review of the record is *de novo. See Marquardt,* 161 Ariz. at 207, 778 P.2d at 242. However, we ordinarily give great deference to the Commission's recommendations. *In re Hendrix,* 145 Ariz. 345, 348, 701 P.2d 841, 844 (1985). We are reluctant, therefore, to reject the recommendations.[7] In our view, however, the recommended thirty-day suspension, followed by what is essentially a few weeks of continuing legal education observing the operation of other courts, is entirely insufficient to deter Respondent from similar conduct in the future. Nor does it sufficiently foster public confidence in judicial integrity. Particularly when it comes to misconduct on the bench, the public must have confidence that this court will require *all judges*—elected or appointed, law trained or not, general or limited jurisdiction—to follow the ethical rules found in the Code.

We believe, therefore, that the goals of judicial discipline will not be served in this case by imposing a sanction of thirty days—a sort of unpaid vacation—followed by some additional schooling. Respondent has already been reprimanded once and admonished twice, demonstrating that lenient sanctions do not deter him and, perhaps, would not deter others who might emulate his behavior. Nor, comparing *Marquardt* on the one hand with *Lehman, Anderson,* and *Gumaer* [8] on the other, do we believe that the

7. We did, however, ask the parties to submit supplemental briefs on the propriety of the sanction and whether it would be appropriate for the court to impose a more severe sanction than recommended by the Commission. In its brief, the Commission candidly states that it does not know what the proper sanction should be and defers to the court. The Commission correctly points out that suspension has only been an option since 1988. *See* Ariz. Const. art. 6.1, § 4. The court has been unable to consider suspension or removal as a sanction because all disciplinary proceedings since then have been against justices of the peace who were no longer in office. Therefore, the Commission has very little, if any, precedent to guide it in its recommendation of suspension lengths.

8. As discussed in this opinion, *Gumaer,* which was decided after the Commission submitted its briefs in this case, is the only case in which suspension was a viable option. In *Gumaer,* the court suspended the judge for ninety days without pay. We believe that the circumstances in *Gumaer* required a much less severe sanction because Judge Gumaer had no prior disciplinary record and had demonstrated his ability to "fairly, effectively, and efficiently run his court." 177 Ariz. at 283, 867 P.2d at 853. This was established to the satisfaction of the Commission, based on testimonials from various public officials. This record contains no such mitigating evidence.

mild sanction recommended is proportional to the severity of the violations. The violations in this case, together with the three violations in his previous cases before the Commission, show that we are dealing with a judge unconcerned with the rules and determined to do it all his way. The defense that the system is inadequate insults the many limited jurisdiction judges who, despite a lack of legal training, huge case loads, and inadequate staff and facilities, do their best to adhere to the Code. We conclude, therefore, that given Respondent's record, neither censure nor a short suspension is appropriate; lenient treatment will neither serve as a deterrent for others nor give our citizens confidence in the integrity of the judicial system. We recognize that Respondent was elected to his office and are well aware that our power to remove those holding elected constitutional office should be used only in extreme circumstances. We conclude, however, that the power of removal is appropriately considered in this case.

Respondent's failure to recuse himself and his initiation of *ex parte* contacts were not minor transgressions. Such violations, of course, can occur inadvertently or for fairly benign reasons. This case, however, is different. This record indicates that Respondent used the power of judicial office for personal reasons: to get even with his enemies, to harass his debtors, and to bestow favors on those whom he chose to befriend.

Under our system of government, judges hold office subject to rules of conduct that are designed to ensure a basic concept of fairness—that judges will dispense justice, not favors or revenge. In the final analysis, Respondent's actions violated not only the Code but this most basic concept of justice. Removal from office is therefore appropriate.

### CONCLUSION

We conclude that Respondent's actions "constitute willful misconduct in office ... [and are] prejudicial to the administration of justice that brings the judicial office into disrepute." Ariz. Const. art. 6.1, § 4. He is therefore removed from the office of Justice of the Peace, effective as of the filing date of this opinion. Under our Constitution, Re-

spondent may not again hold judicial office. *Id.* Respondent is also assessed costs in the amount of $1,283.76.

CORCORAN, ZLAKET, MARTONE, JJ., concur.

MOELLER, Vice Chief Justice, specially concurring.

The opinion correctly points out that great deference should be and is given to the recommendations of the Commission on Judicial Conduct. I am persuaded to deviate from the Commission's recommendation in this particular case. I reach this conclusion primarily because of my view of the extreme gravity of the allegations and findings under Count I, the Gorenc matter. Judge Peck used his judicial office to institute criminal proceedings against another individual for political or personal reasons. This is an intolerable breach of trust on the part of any judge. No one who does that has any place in the Arizona judiciary. In the final analysis, that act alone not only merits removal, but demands it.