875 P.2d 795

**In re Marie A. LORONA, Justice of the Peace, Eloy, Pinal County, State of Arizona, Respondent.**

No. JC–93–0002.

Supreme Court of Arizona.

June 14, 1994.

State Bar of AZ by Harriet L. Turney, Chief Counsel, Sp. Counsel, Phoenix, for Com'n on Judicial Conduct.

Burch & Cracchiolo, P.A. by David G. Derickson, Phoenix, for Marie A. Lorona.

OPINION

CORCORAN, Justice.

### STATEMENT OF THE CASE

On May 21, 1993, the Commission on Judicial Conduct (Commission) found that Marie A. Lorona (respondent), a Justice of the Peace serving in the City of Eloy in Pinal County, violated Canons 1 and 2 of the Code of Judicial Conduct; rule 81, Arizona Rules of the Supreme Court; Ariz. Const. art. 6.1,

§ 4; and rule 11, Rules of Procedure for the Commission on Judicial Conduct. The Commission recommends that this court publicly censure respondent, suspend her without pay for a period of 15 days, assess attorney's fees and costs, and order her to obtain 4 credit hours of judicial education or training in the subject of judicial ethics over the next two years. This appeal follows the Commission's report filed May 21, 1993. We have jurisdiction pursuant to Ariz. Const. art. 6.1, § 4.

## PROCEDURAL HISTORY

On September 14, 1992, Judge Joel Ibarra properly referred a complaint against respondent to the Commission. Canon 3(B)(3), rule 81, Code of Judicial Conduct.[1] In response to Judge Ibarra's complaint, the Commission initiated formal proceedings against respondent on January 27, 1993, alleging two counts of misconduct. Both counts alleged that respondent violated Canons 1 and 2 of the Code of Judicial Conduct by contacting Judge Ibarra, the Eloy City Magistrate, about two of his pending cases. Both counts further alleged that respondent's conduct was prejudicial to the administration of justice and brought her judicial office into disrepute under Ariz. Const. art. 6.1, § 4.

On April 14, 1993, the Commission held a formal hearing and on April 15 issued its Findings of Fact, Conclusions of Law, and Recommendations. Respondent filed objections to the Commission's findings. Special counsel answered respondent's objections, and the Commission filed amended Findings of Fact, Conclusions of Law, and Recommendations on May 21. The Commission concluded that, on both counts, respondent had violated Canons 1 and 2 of the Code of Judicial Conduct, and that her conduct was prejudicial to the administration of justice

and brought her judicial office into disrepute under Ariz. Const. art. 6.1, § 4.

## DISCUSSION

### A. *Standard of Review*

Our constitution grants the Commission on Judicial Conduct the power to recommend to this court the disposition to be made in each case of judicial discipline, and we give serious consideration to the Commission's findings. *In re Haddad,* 128 Ariz. 490, 491, 627 P.2d 221, 222 (1981); *see* Ariz. Const. art. 6.1, § 4. The ultimate authority to impose discipline on a member of the judiciary, however, rests with this court. *Haddad,* 128 Ariz. at 491, 627 P.2d at 222. Thus, in judicial disciplinary matters, this court independently reviews the Commission's record and is the ultimate trier of fact and law. *Haddad,* 128 Ariz. at 491, 627 P.2d at 222.

### B. *Procedural Challenge*

■ Before beginning our independent review of the Commission's findings, we first address respondent's claim that this matter should be resolved informally. Respondent argues that the Commission violated its own rules when it brought formal proceedings against her. We disagree.

In support of her claim, respondent refers us to the 1992 edition of the *Commission on Judicial Conduct Handbook* (Handbook). Relying solely on a section in the Handbook that provides an overview of the Commission, respondent focuses her attention on a subsection within the overview which states: "Listed below are some examples of cases in which the [C]ommission imposed informal discipline." Included in this list are cases involving attempts to influence another judge. *See* Handbook at 3. Respondent mischaracterizes this section as "example[s]

---

1.  At the time Judge Ibarra referred his complaint to the Commission, Canon 3(B)(3) provided:

    A judge should report what he believes clearly to be professional misconduct of a judge or a lawyer to the appropriate disciplinary agency.
    Since then, Canon 3 has been amended to emphasize that the obligation to report judicial misconduct is mandatory. Effective September 1, 1993, Canon 3(D)(1) provides in part:
    A judge who had knowledge or who receives reliable information that another judge has

    committed a violation of this code that raises a substantial question as to the judge's honesty, trustworthiness or fitness as a judge in other respects shall inform the appropriate authority.
    Had Judge Ibarra not reported these two incidents, he would have been violating his own ethical obligations under the Code and thus would have been subject to discipline. *Cf. In re Himmel,* 125 Ill.2d 531, 127 Ill.Dec. 708, 533 N.E.2d 790 (1990).

of cases where the Commission has *traditionally* imposed informal discipline rather than the formal proceedings that are necessary for misconduct of a more serious nature." We do not reach respondent's apparent conclusion that because informal discipline was imposed in at least one case in which a judge attempted to influence another judge, the Commission is required to treat all such allegations in the same manner.

More importantly, we note that the section of the Handbook upon which respondent relies is informative in nature and does not grant respondent—or any other member of the judiciary—any procedural rights or guarantees. The procedural rights and guarantees afforded under the judicial disciplinary process can be found in the Rules of Procedure for the Commission on Judicial Conduct. In fact, the Handbook says as much in the introduction to the complaint process, stating:

> The state constitution and the commission's rules of procedure provide the framework for the initiation and resolution of complaints against judges. The constitution establishes the specific grounds for judicial discipline, and *the rules prescribe the steps that the commission must take in each phase of the complaint process.* The process is very deliberative, and the commission must follow the rules closely in reviewing complaints and making decisions.

Handbook at 4 (emphasis added). The Rules of Procedure for the Commission on Judicial Conduct, which are set forth in the Handbook, do not guarantee that any particular kind of violation will be handled informally. *See* rule 4, Rules of Procedure for the Commission on Judicial Conduct. The rule governing the informal disposition of complaints filed against a judge is discretionary in nature. *See* rule 4, Rules of Procedure for the Commission on Judicial Conduct ("The Commission may informally dispose of a complaint.").

■ Despite respondent's claim that an informal resolution would have been an effective method for resolving the complaints against her, we find that the Commission did not abuse its discretion in choosing to pursue a formal complaint. The violations with which respondent is charged are not minor violations. She is charged with engaging in "conduct prejudicial to the administration of justice" by contacting a city magistrate about two of his pending cases. Significantly, this case does not involve a single, isolated mistake that might justify an informal disposition; each alleged incident involved numerous improper contacts. We find that formal proceedings were warranted under the circumstances, and thus we reject respondent's claim that the Commission was required to handle her complaint informally.

### C. *Respondent's Violations*
#### 1. **Factual Finding**

Respondent urges the court to undertake a *de novo* review and reject or modify certain of the Commission's findings of fact. Respondent argues that the Commission's findings are not supported by clear and convincing evidence because of the conflicting testimony of the witnesses.

■ We agree with respondent that the burden of proof in judicial discipline is by clear and convincing evidence. *Haddad,* 128 Ariz. at 492, 627 P.2d at 223. We note, however, that this burden can be met even when testimony is conflicting. *In re Neville,* 147 Ariz. 106, 110, 708 P.2d 1297, 1301 (1985) (citations omitted); *see also In re Weiner,* 120 Ariz. 349, 353, 586 P.2d 194, 198 (1978) ("[M]ost of the issues of fact in the case were disputed by the parties; however, this did not deter the court from finding that the evidence ... was clear and convincing.").

■ Although this court independently reviews the record, we give serious consideration to the Commission's findings. *Haddad,* 128 Ariz. at 491, 627 P.2d at 222. In our previous judicial disciplinary cases, we had no reason to discuss credibility issues. Our lawyer discipline cases, however, are instructive on this subject because we have previously recognized that, in some respects, judicial discipline is analogous to lawyer discipline. *Haddad,* 128 Ariz. at 491, 627 P.2d at 222. In our lawyer discipline cases, we have stated that:

[T]his court give[s] great weight to the factual findings of a committee, particularly when questions of credibility are involved. *In re Zang*, 154 Ariz. 134, 741 P.2d 267 (1987). The committees have an independent, fact-finding, credibility-weighing function which should be given deference.

*In re Hoover I*, 155 Ariz. 192, 196, 745 P.2d 939, 943 (1987). We give the same deference to the Commission's credibility findings in judicial discipline cases that we do in lawyer discipline cases, which is in accord with other jurisdictions. *See, e.g., Ryan v. Commission on Judicial Performance*, 45 Cal.3d 518, 247 Cal.Rptr. 378, 384, 754 P.2d 724, 730 (1988) ("[W]e give special weight to the factual determinations of the masters, who are best able to evaluate the truthfulness of the witnesses before them.").

■ After independently reviewing the record, we find that the Commission's Findings of Fact are supported by clear and convincing evidence. Accordingly, we adopt these factual findings, which are summarized below.

Respondent has been a non-lawyer justice of the peace in Eloy since 1986. Before 1986, she served as Eloy City Magistrate for two years. She has been actively involved in both judicial and community affairs. Her activities have included: (1) training coordinator for Pinal County Limited Jurisdiction Courts; (2) participation as a faculty member for the New Judge Orientation; (3) chairing and co-chairing the Judicial Conference for Limited Jurisdiction Courts; (4) membership on the Alternative Dispute Resolution Committee; (5) President of the Arizona Justices of the Peace and Constable's Association; (6) President of the Justice of the Peace Association in Pinal County; (7) President of Eloy's Chamber of Commerce; and (8) President of Pinal Hispanic Council. Additionally, since at least 1990, respondent has been a mentor for the Mentor Program, which was implemented to assist new limited jurisdiction judges.[2] As a mentor, respondent was appointed to mentor Judge Ibarra, Eloy's City

Magistrate. During the disciplinary hearing, respondent testified that she attended judicial ethics classes annually.

### a. Count 1

On March 19, 1992, respondent's long time friend, Delora Ann Lopez, received a criminal traffic ticket for passing a school bus that was stopped with its lights flashing. This traffic matter was pending before Judge Ibarra. After discussing the ticket with Ms. Lopez, respondent volunteered to contact Judge Ibarra on her friend's behalf.

In April 1992, respondent contacted Judge Ibarra to discuss Ms. Lopez's ticket. Respondent told Judge Ibarra that Ms. Lopez would have trouble attending traffic school because she was a single parent who worked every day. She also explained that Ms. Lopez was concerned about receiving points on her license. Respondent asked Judge Ibarra if he could do anything with the ticket, suggesting that he could amend the charge to a non-moving violation, which would result in no points being assessed against Ms. Lopez's license. Judge Ibarra responded that the city attorney did not like to offer plea agreements in this type of case. Erroneously believing that Ms. Lopez's ticket was a civil violation, respondent told Judge Ibarra that he had the discretion to sentence Ms. Lopez under the non-moving violation provisions. Judge Ibarra agreed to amend the ticket and to impose a $54.00 fine when Ms. Lopez came into court.

A few days later, one of respondent's clerks delivered a check for $54.00 to Judge Ibarra's court. The check was from Ms. Lopez and was payable to the City of Eloy. After a few days, however, when Ms. Lopez did not appear in court, Judge Ibarra tried calling Ms. Lopez at her home. Instead of returning Judge Ibarra's calls, Ms. Lopez called respondent to find out why Judge Ibarra was calling her. Respondent called Judge Ibarra and told him that Ms. Lopez was very upset over his calls. During their conversation, Judge Ibarra told respondent that Ms. Lopez needed to come into his court

2. The Mentor Program is part of the New Judge Orientation Program conducted by the Arizona Supreme Court.

to have her traffic matter concluded. Thereafter, Ms. Lopez appeared in court and the traffic violation was resolved.

### b. Count 2

On August 2, 1992, Brendon Ryan Mitchell, respondent's step-grandson, received a traffic citation for an improper right turn. Judge Ibarra had jurisdiction over this matter.

Mr. Mitchell discussed this ticket with respondent at her office, and respondent agreed to contact Judge Ibarra for him. On August 17, 1992, respondent telephoned Judge Ibarra and left a message that she wanted to talk with him about Brendon Mitchell. Judge Ibarra did not return respondent's call; however, he eventually took her later call. During their conversation, respondent told Judge Ibarra that her step-grandson had received a ticket, that he was attending college, and that he was concerned about the fine. Respondent asked Judge Ibarra if he could give Mr. Mitchell a suspended sentence and Judge Ibarra agreed to do so.

Judge Ibarra expected Brendon to appear before his court, and when Brendon failed to appear, Judge Ibarra called respondent and informed her of this fact. Respondent questioned the need for Brendon's appearance, stating that the matter could be handled through the mail. Judge Ibarra agreed to allow Brendon to handle the matter by mail, and told respondent to have Brendon mail a letter to the court stating his plea. Shortly thereafter, respondent called Judge Ibarra and asked if he would agree to having her grandson sign a minute entry. Judge Ibarra agreed.

On September 15, 1992, not having received anything from Mr. Mitchell, Judge Ibarra issued an Order to Show Cause ordering Mr. Mitchell to appear on September 21, 1992 and show cause why he should not be held in contempt for failure to comply with the court's order. On September 21, 1992, respondent's husband telephoned Judge Ibarra and asked whether the entire matter could be resolved by his paying the fine. Judge Ibarra told Mr. Lorona that he could pay the fine and that Mr. Mitchell would not need to appear before the court.

Later that day, respondent called Judge Ibarra. Her message said that she wanted to speak to him about her grandson and that she wanted to know why Judge Ibarra had told her husband that Brendon owed $52.00 after he said that he would suspend Brendon's sentence. When Judge Ibarra did not return her call, respondent went to his office to discuss the matter. The next day, Mr. Lorona paid Mr. Mitchell's fine.

### 2. Legal Discussion and Conclusions

Based on these facts, the Commission concluded that respondent violated Canons 1 and 2 of the Code of Judicial Conduct because her contacts with Judge Ibarra carried the appearance of impropriety and reasonably could have influenced Judge Ibarra to act differently than he would have but for the contacts. The Commission also concluded that respondent's conduct was "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" under Ariz. Const. art. 6.1, § 4. We agree.

"Canon 2 provides that a judge should avoid impropriety and the appearance of impropriety in all his activities." [3] *In re Lockwood,* 167 Ariz. 9, 14, 804 P.2d 738, 743 (1990). Section A of Canon 2 of the Code of Judicial Conduct; rule 81, Arizona Rules of the Supreme Court, provides: "A judge should ... conduct himself at all times in a manner that promotes public confidence in the integrity and *impartiality* of the judiciary," whereas section B of Canon 2 provides in part: "A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others." As one court stated when discussing the requirements of Canon 2: "A judge is expected to act in a manner inspiring confidence that even-handed treatment is afforded to everyone coming into contact with the judicial system." *In re Miller,* 223 Kan. 130, 572 P.2d 896, 897 (1977) (citations omitted); *see also Haddad,* 128 Ariz. at 498, 627 P.2d at 229 (judges have

---

3. We begin with respondent's violation of Canon 2 because, under these facts, a violation of Canon 2 necessarily results in a violation of Canon 1. *See* discussion *infra.*

positive obligation "not only to be impartial but to be seen to be impartial").

In this case, respondent lent the prestige of her office to advance the private interests of her friend and her step-grandson. Both were given preferential treatment. Both obtained this preferential treatment because of their personal relationship with respondent. Respondent's conduct clearly did not promote public confidence in the integrity and impartiality of the judiciary as required by Canon 2. *See In re Hendrix,* 145 Ariz. 345, 348, 701 P.2d 841, 844 (1985).

Having found that respondent's actions violated Canon 2, a finding that her actions also violated Canon 1 is inevitable under these facts. "Canon 1 sets forth a judge's duty to uphold the integrity and independence of the judiciary." *Lockwood,* 167 Ariz. at 14, 804 P.2d at 743. Because "[a]n independent and honorable judiciary is indispensable to justice in our society, Canon 1 directs judges to 'observe high standards of conduct' so that the integrity and independence of the judiciary may be preserved." Canon 1, Code of Judicial Conduct; rule 81, Arizona Rules of the Supreme Court. Nothing diminishes the public's respect for and confidence in the judiciary more than either the perception of or actual unequal administration of justice. *See, e.g., Haddad,* 128 Ariz. at 498, 627 P.2d at 229; *In re Inquiry Concerning a Judge,* 788 P.2d 716, 722 (Alaska 1990) (citations omitted). Respondent's interference in matters that were pending before Judge Ibarra concerning her friend and relative necessarily raises doubts about the judiciary's honor or integrity, and thus violates Canon 1.

By attempting to influence her colleague's handling of these two matters, respondent misused her position as a member of the judiciary. Although respondent eventually acknowledged that her actions may have created the appearance of impropriety, she never conceded that they were improper. We find, however, that her actions were plainly improper. We agree with the Commission that these improper contacts were prejudicial to the administration of justice and brought her office into disrepute within the meaning of Ariz. Const. art. 6.1, § 4; *cf. In re Gumaer,* 177 Ariz. 280, 282, 867 P.2d 850, 852

(1994) (finding misconduct committed while not acting in official capacity as justice of the peace prejudicial to administration of justice).

### 3. Sanctions

■ Having found that respondent engaged in judicial misconduct, we turn to sanctions. In determining the appropriate sanction, we are guided by the principle that our goal in imposing sanctions is to protect the public and foster judicial integrity—not to punish. *Haddad,* 128 Ariz. at 492, 627 P.2d at 223. The imposition of appropriate sanctions deters similar conduct by others, which fosters public confidence in our self-policing system. *In re Peck,* 177 Ariz. 283, 287, 867 P.2d 853, 857 (1994).

■ The ultimate authority to determine proper sanctions rests with this court. *See* Ariz. Const. art. 6.1, §§ 3 and 4; *see also Haddad,* 128 Ariz. at 491, 627 P.2d at 222 (burden of imposing sanction is put squarely on Supreme Court). Nevertheless, "we ordinarily give great deference to the Commission's recommendations." *In re Peck,* 177 Ariz. at 290, 867 P.2d at 860. In this case, the Commission unanimously recommends that we publicly censure respondent, suspend her without pay for a period of 15 days, assess attorney's fees and costs, and order her to obtain 4 credit hours of judicial education or training in the subject of judicial ethics over the next 2 years.

Respondent raises two challenges to the Commission's recommendations. She argues that the Commission's recommendation of a 15-day suspension is excessive. She also argues that rules 4(c) and 10(c) of the Rules of Procedure for the Commission on Judicial Conduct and article 6.1, § 4 prohibit the Commission from recommending both censure and suspension.

#### a. *Challenges to Commission's Recommendations*

Respondent makes three arguments in support of her claim that the recommended

sanctions are too severe.[4] She argues that the Commission's recommended sentence is disproportionate to the sanctions that we have imposed in other judicial discipline cases. We agree with respondent that her misconduct was less egregious than the misconduct committed in the disciplinary cases that she cited,[5] and we acknowledge that we only censured the offending judges in these cases. These cases, however, have no impact on the outcome of this case because, at the time the court censured these judges, suspension was not an option. In one group of cases, the judges were already off the bench by the time the disciplinary action reached this court, and in the other group of cases, our constitution limited the court to either censuring or removing the judge. *See Hendrix*, 145 Ariz. 345, 701 P.2d 841 (constitutional limitations); *Weeks*, 134 Ariz. 521, 658 P.2d 174 (same); *Haddad*, 128 Ariz. 490, 627 P.2d 221 (same); *see also Anderson*, 168 Ariz. 432, 814 P.2d 773 (judge already off bench); *In re Lehman*, 168 Ariz. 174, 812 P.2d 992 (1991) (same). Accordingly, we reject respondent's disproportionality argument.

■ Citing *In re Marquardt*, 161 Ariz. 206, 216, 778 P.2d 241, 251 (1989), respondent also argues that "suspension is a sanction that is reserved for those occasions where a judicial officer engages in wilful misconduct or knowingly and intentionally violates the Code of Judicial Conduct." Because she did not engage in wilful misconduct and because the Commission did not find that she intended to violate the Code of Judicial Conduct, respondent argues that suspension is not warranted in her case.

We begin by noting that, under our constitution, this court may suspend a judge for committing "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." Ariz. Const. art. 6.1, § 4. Thus, respondent's argument that she cannot be suspended because the Commission did not find that she committed wilful misconduct fails. Moreover, although this court suspended Judge Marquardt because he had knowingly and intentionally committed a misdemeanor drug offense in Texas, which in Arizona would have been an open ended offense that could be treated either as a felony or a misdemeanor, *Marquardt* is not to be read as requiring any specific "mental state" as a prerequisite to suspension or removal. We mentioned the mental state in Judge Marquardt's case only because his misconduct involved the commission of a crime to which the mental state of "knowingly and intentionally" attached.

Respondent, again citing *Marquardt*, argues that as an elected non-lawyer who holds office as a justice of the peace, she is held to a lower standard than law trained and merit selection judges. In dicta, this court has suggested that it might hold merit selection judges to a higher standard than elected non-lawyers who hold a judicial or quasi-judicial office. *Marquardt*, 161 Ariz. at 216, 778 P.2d at 251. Our recent decision in *Peck*, however, implies a departure from this blanket statement and represents a better approach to our treatment of merit selection judges and elected non-lawyers who hold judicial office. In *Peck*, we recognized that "the public must have confidence that the court will require *all judges*—elected or appointed, law trained or not, general or limited jurisdiction—to follow the ethical rules found in the Code." *Peck*, 177 Ariz. at 290, 867 P.2d at 860. The court in *Peck* implied that any disparate treatment in disciplinary sanctions must be warranted by the differences in the offices, experience, and educational background of those holding the offices. *See Peck*, 177 Ariz. at 288, 867 P.2d at 858 (justice of the peace's "ignorance of the law might constitute mitigation if, lacking a formal legal education, [r]espondent had violated one of the Code's obscure or technical provisions").

---

4. Respondent also argues that censure is an appropriate sanction considering her involvement with civic and judicial organizations. We address this claim in our discussion of appropriate sanctions in light of respondent's violation and any mitigating or aggravating factors.

5. Specifically respondent relies on *In re Anderson*, 168 Ariz. 432, 814 P.2d 773 (1991); *In re Lehman*, 168 Ariz. 174, 812 P.2d 992 (1991); *Hendrix*, 145 Ariz. 345, 701 P.2d 841; *In re Weeks*, 134 Ariz. 521, 658 P.2d 174 (1983); *Haddad*, 128 Ariz. 490, 627 P.2d 221.

■ Nothing in this case suggests that respondent, by virtue of her position as an elected non-lawyer justice of the peace, should not be held to the same standard as a law-trained or merit selection judge who committed the same violation. Her conduct did not violate some technical provision of the Code of Judicial Conduct. Basic instincts of fairness should have alerted respondent that she should not use her position as a member of the judiciary to influence a judicial colleague's handling of her friend's or relative's cases. This is especially true for respondent, who has had substantial ethics training. Under these circumstances, we find no reason to treat respondent any differently than we would treat a merit selection judge who committed a similar violation.

b. *Appropriateness of Recommended Sanction*

Having rejected respondent's arguments that a 15–day suspension is excessive, we now consider what sanction is appropriate in light of respondent's violations, together with any mitigating and aggravating factors. The record indicates that respondent used her position to influence her colleague's handling of two of his pending cases. We cannot stress enough the seriousness of respondent's violations—her conduct goes to the very integrity of our judicial system. "Under our system of government, judges hold office subject to rules of conduct that are designed to ensure a basic concept of fairness—that judges will dispense justice, not favors or revenge." *Peck*, 177 Ariz. at 291, 867 P.2d at 861.

Having found respondent's conduct to be a serious violation of the Code of Judicial Conduct, we consider any additional factors that are relevant in fashioning a sanction that will effectuate the goals of judicial discipline. We begin with those factors that suggest a more exacting sanction is required—aggravating factors.

We agree with the Commission that respondent's repeated contacts with Judge Ibarra, on two separate cases, is an aggravating factor. Such conduct constitutes a pattern of misconduct and multiple offenses. We also agree that respondent's failure to acknowledge the wrongful nature of her conduct is an aggravating factor. Respondent stated that she attended yearly ethics courses and, from those classes, she knew that it was improper for her to contact another judge about cases pending before that judge when she had a friendship or a personal relationship with the person involved in the case. Nevertheless, respondent denied her misconduct until it was patently obvious that the members of the Commission were not accepting her rationalizations. And, even then, she would concede only that her conduct might have had the appearance of impropriety. She never reached the conclusion that this court reached—that her conduct was plainly improper. In light of her "purported" understanding of the Canons of Judicial Ethics, we are troubled by respondent's failure to acknowledge the wrongfulness of her actions.

In mitigation, we consider respondent's involvement in numerous judicial associations and training programs, her participation in the Mentor Program, and her involvement in community affairs. We note, however, that her position as a Mentor works as a double edged sword in this case. Because of the added training that she received to participate in the Mentor Program, she, better than anyone, should have known to avoid this situation. More importantly, as the mentor assigned to Judge Ibarra, she exploited her special relationship with Judge Ibarra to further her own agenda.

In light of the foregoing, we conclude that the 15–day suspension recommended by the Commission is woefully inadequate. Respondent's actions represent an abuse of her office that goes to the heart of judicial integrity. After independently reviewing the record, we conclude that the goals of judicial discipline will best be served by our suspending respondent for a period of 90 days, assessing attorney's fees and costs against respondent, and requiring her to obtain 4 credit hours of judicial education or training in the subject of judicial ethics. Unlike the Commission, we see no additional benefit in censuring respondent in addition to suspending her. As far as the court is concerned, the "censure" is subsumed in the greater

**570**

sanction. Having reached this result, we need not address respondent's claim that the Arizona Constitution limits us to imposing either a censure or a suspension, but not both.

## CONCLUSION

We conclude that respondent's conduct constitutes conduct prejudicial to the administration of justice that brings the judicial office into disrepute. Ariz. Const. art. 6.1, § 4. For the foregoing reasons, we suspend respondent from the office of Justice of the Peace, without pay, for a period of 90 days. Respondent also is required to obtain 4 credit hours of judicial education or training in the subject of judicial ethics over the next two years, which are to be in addition to the mandatory continuing education requirements. Finally, respondent shall reimburse the Commission for the attorney's fees and costs associated with this disciplinary action.

MOELLER, V.C.J., and ZLAKET and MARTONE, JJ., concur.

FELDMAN, C.J., recused himself in this matter and did not participate in its determination.